765 F.2d 329
 HUDSON TRANSIT LINES, INC., Hudson Transit Corp., Petitioners,
v.
UNITED STATES of America, INTERSTATE COMMERCE COMMISSION and
Pine Hill-Kingston Bus Corp., Respondents,
HUDSON TRANSIT LINES, INC., Hudson Transit Corp., Petitioners,
v.
UNITED STATES of America, INTERSTATE COMMERCE COMMISSION and
Adirondack Transit Lines, Inc., Respondents,
American Bus Association, Intervenor.
STATE of NEW JERSEY, DEPT. OF TRANSPORTATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
 Nos. 105, 262, 393 to 396, Dockets 83-4165, 83-4171,
84-4077, 84-4079, 84-4105 and 84-4107.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 19, 1984.
Decided June 17, 1985.
 
 Samuel B. Zinder, Great Neck, N.Y. (Samuel B. Zinder, P.C., Great Neck, N.Y., of counsel), for petitioners Hudson Transit Lines, Inc. and Hudson Transit Corp.
 Masha D. Rozman, Deputy Atty. Gen., Trenton, N.J. (Irwin I. Kimmelman, Atty. Gen. of N.J., James J. Ciancia, Asst. Atty. Gen., Trenton, N.J., of counsel), for petitioner N.J. Dept. of Transp.
 Laurence H. Schecker, Washington, D.C. (Robert S. Burk, Ellen D. Hanson, I.C.C., Washington, D.C., (J. Paul McGrath, Robert B. Nicholson, Margaret Halpern, Dept. of Justice, Washington, D.C., of counsel), for respondents.
 Before LUMBARD, MANSFIELD and CARDAMONE, Circuit Judges.
 CARDAMONE, Circuit Judge.
 
 
 1
 Since the end of World War II Americans' overwhelming preference for the use of their private automobiles has been the primary cause of a seriously eroded public transport. As a result, the intercity passenger bus industry in the United States is in a state of decline that shows little sign of turning about. During the depths of the depression in the 1930's there was widespread concern over the creation of an oversupply of passenger transportation. To meet this concern, Congress in 1935 empowered the Interstate Commerce Commission to bring about equality of regulation between intrastate and interstate motor carriers to prevent such an oversupply. In the last decade the winds of deregulation have swirled through the legislature, first sweeping away the ICC's authority over rail and air travel, and then leading Congress to enact the Bus Regulatory Reform Act of 1982, designed to deregulate the ailing bus industry. Congress's new prescription for the financially ailing bus industry, embodied in the 1982 legislation, places a new emphasis on increased competition and aims to rejuvenate intercity bus travel.
 
 
 2
 These consolidated appeals are taken from decisions of the Interstate Commerce Commission (ICC or Commission) granting applicant bus companies unrestricted authority to transport passengers in the suburban New York City area and to Atlantic City, New Jersey. In the first group of cases an existing commuter service carrier has challenged the Commission's refusal to impose operating restrictions on its grant of certain licenses permitting applicants to provide service. In the second group of cases the State of New Jersey has challenged ICC orders that authorized two carriers to provide bus service to Atlantic City, claiming that such service would constitute prohibited special operations. These issues require us to analyze, for the first time, the Bus Regulatory Reform Act of 1982. Before analyzing these issues, it is necessary to review briefly Congress's involvement in the interstate bus industry.
 
 I REGULATORY BACKGROUND
 
 3
 Intercity bus transportation in the United States had its genesis around 1910. By 1930 virtually every state regulated the industry. Because of the Supreme Court's ruling in Buck v. Kuykendall, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925), the scope of state regulation was limited to intrastate bus transportation, leaving unregulated the growing interstate bus industry. In the 1930's bus companies, trade associations, railroads, and state regulatory agencies called for federal legislation. The depression had undercut the financial stability of many carriers, and it was feared that competition would drive them out of business. Falling prices had caused many carriers to lower their service and safety standards.
 
 
 4
 In response Congress enacted the Motor Carrier Act of 1935 which led to the organization of a highly regulated, public utility-type bus industry. That Act empowered the Commission to control the number of carriers and the service provided. The Act's licensing provisions, which applied equally to motor carriers of property and passengers, required motor carriers to demonstrate to the ICC that they were "fit, willing, and able" to perform the proposed service, and that the service was "required by the present or future public convenience and necessity." Motor Carrier Act of 1935 Sec. 207(a), 49 U.S.C. Sec. 307(a) (1976) (later codified at 49 U.S.C. Sec. 10922(a) (Supp. IV 1980)), amended by Bus Regulatory Reform Act of 1982 Sec. 7, 49 U.S.C. Sec. 10922(c) (Bus Regulatory Reform Act sections hereinafter referred to by sections of Title 49, U.S.C.). The Commission could issue a certificate only for operations over a "regular route and between specified places." 49 U.S.C. Sec. 10922(e)(3) (Supp. IV 1980). Regular-route service involves scheduled transportation between fixed points over specific routes or highways. See Falwell v. United States, 69 F.Supp. 71, 77 (W.D.Va.1946), aff'd, 340 U.S. 807, 67 S.Ct. 1087, 91 L.Ed. 1264 (1947). This type of service operates on a published timetable so that passengers can wait at a terminal or roadside stop on a designated route and be confident that sooner or later a bus will come along to collect them. The regular-route system eventually covered all of the United States, Canada, and Mexico and it is now possible to make a journey by bus from Alaska to Panama. See Thoms, Unleashing the Greyhounds--The Bus Regulatory Reform Act of 1982, 6 Campbell L.Rev. 75, 87 (1984).
 
 
 5
 The Commission first established the test which it would use to apply the "public convenience and necessity" standard in Pan-American Bus Lines Operation, 1 M.C.C. 190, 203 (1936), stating:
 
 
 6
 The question, in substance, is whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.
 
 
 7
 To prevent an oversupply of transportation, the Commission applied this test for over 40 years.
 
 
 8
 By the early 1970's economists and administrators clamored for a change and urged the creation of a regulatory scheme that would abandon the protectionist system of the 1935 Act and encourage free market management of the industry. See Adams, A Changing Transportation Policy for the 1980's, 17 Harv.J. on Legis. 397, 397-98 (1980). As a consequence, the ICC began more frequently to consider the benefits of competition in reaching its decisions, see Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 297-99, 95 S.Ct. 438, 447-48, 42 L.Ed.2d 447 (1974) (recognizing the Commission's "prerogative" to adopt a "policy of facilitating competitive market structure"). It shifted the burden with respect to the third part of the Pan-American guidelines to require the objectant to show that existing operations would be impaired in a way that would harm the public interest, see Airport Shuttle Service, Inc. v. I.C.C., 676 F.2d 836, 839 n. 5 (D.C.Cir.1982), and modified the Pan-American test by eliminating the second, and most "protectionist," criterion, see Assure Competitive Transportation, Inc. v. United States, 635 F.2d 1301, 1305-06 (7th Cir.1980) (finding it within the Commission's power to give more weight in its decisions to "the benefits of healthy competition and less to protecting existing carriers"). The Commission concluded that a more competitive market with easier entry would allow new carriers to provide efficient service using modern technology.
 
 
 9
 Thus, although the Commission had shifted its decision-making emphasis, the 1935 Act remained virtually unchanged until Congress enacted the Motor Carrier Act of 1980. This Act effected two major revisions. First, it eased entry into, and significantly reduced barriers to competition in, the trucking industry. The House Report, H.R.Rep. No. 1069, 96th Cong., 2d Sess. 3, reprinted in 1980 U.S.Code Cong. & Ad.News 2283, 2285, stated:
 
 
 10
 The legislation establishes a new Federal policy which is to promote a competitive and efficient motor carrier industry in order to accomplish certain goals. Those goals include meeting the needs of shippers, receivers, and consumers; allowing price flexibility; encouraging greater efficiency, particularly in the use of fuel; and providing service to small communities.
 
 
 11
 Congress designed the 1980 Act "[to] increase[ ] opportunities for new carriers to get into the trucking business and for existing carriers to expand their services." Id. It virtually eliminated collective ratemaking in the trucking industry. Id. at 2285-2286. Second, it revised the procedural handling of all motor carrier cases to expedite the proceedings before the Commission. The new procedures allowed the ICC to handle almost all of its cases without formal hearings or personal appearances by the parties. Oral hearings are used infrequently. 49 C.F.R. Secs. 1160.68, 1160.72 (1984). See American Transfer & Storage Co. v. ICC, 719 F.2d 1283, 1301 (5th Cir.1983). The 1980 Act did not affect the licensing of buses.
 
 
 12
 In 1982 Congress enacted the Bus Regulatory Reform Act (Bus Reform Act or Act), the statute before us on this appeal. Picking up where the Motor Carrier Act of 1980 left off, the Bus Reform Act was designed to facilitate entry into the intercity passenger carriage market by replacing the traditional "public convenience and necessity" test with a "public interest" test. Sen.Rep. No. 411, 97th Cong., 2d Sess. 15, reprinted in 1982 U.S.Code Cong. & Ad.News 2308, 2322 (the "public interest requirement" was intended to be "interpreted as a substantially lesser entry standard test than the traditional public convenience and necessity standard").
 
 
 13
 The procedure for obtaining authorization to operate regular-route service works as follows. First, an applicant must show the ICC that it is "fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with [the Act] and regulations of the Commission." Sec. 10922(c)(1)(A). See 49 C.F.R. Sec. 1160.71 et seq. At this initial stage the ICC inquires about the applicant's safety record and whether it meets the minimum financial requirements found in Sec. 10927. Sec. 10922(c)(6). Further, the proposed regular-route transportation must be subject to the jurisdiction of the Commission.[1] After publication of the proposed service in the Federal Register, any motor carrier described in Sec. 10922(c)(7) may protest the issuance of the certificate. The protestant has the burden of proving that the applicant is not fit, willing, and able to provide the proposed service, or that "the transportation to be authorized is not consistent with the public interest." Sec. 10922(c)(1)(A).
 
 
 14
 In making its findings relating to public interest, the Act directs the Commission to consider the following factors: (A) "the transportation policy" of the Act; (B) the "value of competition to the traveling and shipping public;" (C) the effect of issuance of a certificate on "motor carrier of passenger service to small communities;" and (D) whether issuance of a certificate would impair the ability of any other motor carrier to provide service "except that diversion of revenue or traffic" from another motor carrier, in and of itself, will not be sufficient to support a finding that the grant of authority will impair the ability of the other carrier to operate. Sec. 10922(c)(3). Congress outlined the "transportation policy" of the Act in Sec. 10101, listing a number of interests. The Commission must continually balance the interest in economic efficiency and competition with the interest in safe and adequate service.
 
 
 15
 The importance of competition in bringing about efficient transportation services is the critical policy consideration that the Commission must weigh in resolving licensing protests that relate to public interest. In the view of Congress, competition between carriers brings about better wages for employees, lower rates for consumers, and more efficient use of technology, equipment, and fuel. Sec. 10101. The Act is designed to achieve these ends by limiting what the applicant must show to acquire a certificate and by expediting the licensing procedures in order to relax entry requirements. Its procedures are designed to promote service to intermediate points by removing restrictions on existing licenses, Sec. 10922(i)(4), and to facilitate the granting of certificates for service along intrastate routes over which federal authority has been, or will be granted. Sec. 10922(c)(2)(A), (B).
 
 
 16
 Congress did not plan to abandon all control of intercity bus travel and leave its fate in the hands of the marketplace. See Sen. Rep., supra, at 16 ("It should be clearly understood, however, that the burden placed on protestants is not insurmountable, and that the entry test should not be treated by the ICC as a regulatory charade"). Congress sought to maintain service to smaller communities, foster commuter service, and ensure adequate bus service to as many people as possible. With almost every licensing application, if a carrier protests the issuance of a certificate, the Commission must evaluate how the proposed service will affect smaller communities and existing commuter operations, see Sec. 10922(c)(1)(A), (2)(A), (2)(B), and (i)(4).[2] In special cases involving bus service to isolated communities and service that will substitute for discontinued rail service or, in some cases, discontinued bus service, the Act presumes that the proposed service is in the public interest. In these cases all that the Act requires is that the applicant prove that it is fit, willing, and able to perform. Sec. 10922(c)(4). With this review of the regulatory background, we turn to the first series of cases on this consolidated appeal.
 
 II COMMUTER OPERATIONS
 
 17
 (Docket Nos. 83-4165, 83-4171, 84-4077 and 84-4079 )
 
 A. Background
 
 18
 Pine Hill-Kingston Bus Corporation (Pine Hill) and Adirondack Transit Lines, Inc. (Adirondack) are affiliated bus companies that for several years have transported passengers over regular routes extending between New York City and points in northeastern New Jersey and New York State. Shortly after the Bus Reform Act became effective, Pine Hill and Adirondack filed applications with the ICC pursuant to Sec. 10922(c) seeking Certificates of Public Convenience and Necessity over these routes. The proposed service was essentially the same in geographic scope and scheduling as the existing operations. The applications proposed to consolidate these existing routes and redescribe them so as to remove operating restrictions that prevented service at certain points. In accordance with the Act and ICC regulations the applicants submitted their insurance and safety records to show that they were "fit, willing, and able" to provide the requested service.
 
 
 19
 Many of the applicants' existing routes were between various cities in upstate New York and New York City along a commuter corridor that includes Bergen County in New Jersey and Rockland and Orange Counties in New York (commuter corridor). The old licenses did not permit the applicants to provide local service along the commuter corridor. For example, Pine Hill's and Adirondack's licenses did not permit them to pick-up or discharge passengers between Paramus, New Jersey and New York City or between Monroe or Suffern, New York and New York City. Consequently, Pine Hill and Adirondack historically served only long-haul intercity routes. The certificates for which they applied would grant them the right to provide unrestricted service at all points in the commuter corridor.
 
 
 20
 Pine Hill also requested unrestricted authority for a proposed Route (4) between Kingston, New York and Rockland County via Newburgh, New York along local highways. This route--when tacked to Pine Hill's other routes--would allow it to provide service between these bedroom communities and New York City. Pine Hill evidently held licenses for service along Route (4), but has made little use of it since the construction of the New York State Thruway.
 
 
 21
 A third carrier, Fugazy Express, Inc. (Fugazy), filed applications seeking authority to transport passengers between Rockland County and Atlantic City through New York City and between Goshen and Suffern, New York. Like Pine Hill and Adirondack, Fugazy has not provided commuter service along these routes. But by tacking an unrestricted Goshen-Suffern route to its Atlantic City route, Fugazy could provide any type of service, including commuter service, along much of the commuter corridor.
 
 
 22
 In response to these applications, Hudson Transit Lines (interstate service) and Hudson Transit Corporation (intrastate service) (Hudson), filed protests pursuant to Sec. 10922. Hudson is a commuter service carrier that transports passengers along the commuter corridor to New York City. It argued that because the applicants' proposed service duplicated existing commuter routes, a grant of unrestricted authority would adversely impact service on these routes and be inconsistent with the public interest. Hudson presented evidence of the number of passengers it carried, its seating capacity, and schedules, along with data for each of its principal routes. Protestant concluded that granting applicants unrestricted authority along the commuter corridor would divert over 20% of its operating revenue and force it to reduce both regular-route commuter service and service to smaller communities. It urged the ICC to restrict the grant of authority and to delete Route (4) from Pine Hill's route authority. Pine Hill and Adirondack filed a brief reply in which they reiterated that the purpose of their application was to consolidate all of their routes into one document. They explained that they would not oppose a restriction against "commuter operations" between New York City and those counties served by Hudson. Pine Hill also acquiesced in the deletion of its Route (4).
 
 
 23
 In separate written decisions the Commission Review Board (Board) granted each of the applications and issued unrestricted certificates. The Board concluded that each applicant was "fit, willing, and able to provide the transportation to be authorized by the certificate," within the meaning of Sec. 10922(c)(6), and that protestant Hudson had not proved that "the transportation to be authorized is not consistent with the public interest." Sec. 10922(c)(1)(A). The Board first concluded that the structure of the Act and the transportation policy evince a legislative intent that strongly disfavors the imposition of operating restrictions. It specifically found that the impetus behind filing these applications was the desire to eliminate restrictions in order to provide better service. It next concluded that after examining Hudson's evidence the unrestricted grants were consistent with the public interest. Although the Board recognized Congress's concern for the provision and maintenance of commuter bus operations, it characterized Hudson's fears for commuter service as "speculative" and concluded that the unrestricted grants would not adversely affect commuter operations or existing service to smaller cities. Hudson appealed the Board's determination to the Interstate Commerce Commission, which summarily affirmed the Board's decisions.
 
 
 24
 Hudson then petitioned the ICC for extraordinary relief. In denying the petition, the ICC expanded the explanation of its decision to grant the certificates. It pointed out again the policy against the imposition of restrictions. It found that the proposed commuter operations restrictions, at least to some extent, served no useful purpose, were unclear or confusing, and were unduly restrictive. It stated that the Act did not even permit restrictions on "commuter operations." Summarizing the data Hudson submitted, the ICC, like the Board, concluded that protestant had not shown that the impact of the proposed service would be contrary to the public interest. Hudson now seeks review of the ICC's refusal to prohibit Pine Hill, Adirondack, and Fugazy from performing commuter operations and to delete a portion of Pine Hill's application. Before discussing the merits, we focus briefly on the scope of review on an appeal from an Executive Branch agency.
 
 B. Scope of Review
 
 25
 A court reviewing a decision made by an administrative agency shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1982). Failure to adhere to any of these standards will cause a reviewing court to set aside agency action.
 
 
 26
 Although this may appear to grant courts broad power to review agency action, such is not the case. The scope of review under the "arbitrary and capricious" standard is narrow. A court may set aside an administrative determination only where there has been a clear error of judgment, Bowman Transportation, 419 U.S. at 285, 95 S.Ct. at 441, and may not substitute its judgment for that of the administrative agency. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). When the controversy before an agency calls for it to reconcile conflicting policies that Congress by statute committed to its care, courts should hesitate to disturb the administrative determination.
 
 
 27
 Within this limited scope of review, a court must undertake a searching inquiry into the facts and satisfy itself that the agency has articulated a "rational connection between the facts found and the choice made." Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). The reason for this is that a court has a strong stake in the kind of record presented to it for review. The agency must indicate the basis on which it exercised its expert discretion in order for an appeals court to conduct an orderly review of the record. SEC v. Chenery Corp., 318 U.S. 80, 94-95, 63 S.Ct. 454, 462-463, 87 L.Ed. 626 (1943). And while a reviewing court may not supply the basis for the agency's decision, lest it interfere with matters that Congress entrusted to the executive agency, it will uphold a decision of less than ideal clarity if the "path which [the agency] followed can be discerned." Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945). See SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).
 
 C. Discussion
 
 28
 After carefully reviewing each opinion of the Board and the Commission in light of these precepts regarding our scope of review, we have concluded that the ICC's decisions to grant the Pine Hill and Adirondack applications and Fugazy's Goshen-Suffern route applications were not arbitrary and capricious. Congress structured the Act to facilitate entry into the bus industry and indicated its disfavor for the imposition of restrictions on grants of authority. Concededly, this creates an extremely difficult burden of proof for protestants like Hudson. But increased competition is the key to the Act. The protectionist goals of previous bus legislation have been abandoned. Thus, absent clear evidence that the issuance of an unrestricted certificate would be inconsistent with the public interest, we cannot set aside the Commission's actions. As just noted, a reviewing court's inquiry is limited to whether the ICC made a clear error of judgment. That we cannot say it has done.
 
 
 29
 1. Whether the ICC Decision Was Arbitrary and Capricious
 
 
 30
 Hudson has not challenged the ICC's finding that each of the applicants is "fit, willing, and able" to provide the proposed service. Under the Act an applicant must prove only that it has a sufficient amount of insurance coverage, and that it is in compliance with applicable safety regulations. Sec. 10922(c)(6). Hudson argues that the Commission acted in an arbitrary and capricious manner in determining that the proposed service is consistent with the public interest. Hudson argues that the Commission acted in an arbitrary and capricious manner.
 
 
 31
 In applying the public interest test, the Act requires the ICC to balance many interests, and a reviewing court may not overrule the balance achieved, unless the agency has acted clearly outside the Congressional mandate. See 5 U.S.C. Sec. 706(2)(A). The ICC based its decisions in these cases on the following conclusions: that the Act disfavors the imposition of operating restrictions, and that the protestant's assertions that the unrestricted grants would be inconsistent with the public interest were speculative. We affirm the Commission's determinations in these cases because "the path which it followed can be discerned." Colorado Interstate Gas Co., 324 U.S. at 595, 65 S.Ct. at 836.
 
 
 32
 The ICC interpreted the Act as signalling a legislative intent strongly disfavoring the imposition of operating restrictions. Although a broad policy against restrictions might reasonably provide some support for the ICC's conclusions, such cannot substitute for a reasoned analysis of the evidence presented. See RTC Transportation, Inc. v. ICC, 708 F.2d 617 (11th Cir.1983). In RTC, a trucking case, the court ordered the ICC to vacate its decision because it had acted "solely because of a policy against restrictions" without further explanation. Id. at 620 (emphasis added). Congress shouldered protestants with the difficult burden of proving that the public interest requires the imposition of an operating restriction; the burden is especially difficult in light of a restriction's inherently anticompetitive nature. Yet, as noted earlier, the legislature did not propose to make protestants' chances a charade.
 
 
 33
 Rejecting the parties' efforts to impose operating restrictions in this case, the Board cited "Congress' concern that motor carriers of passengers were unduly burdened with route restrictions which hampered the industry's ability to serve the public interest, and its desire for greater flexibility of service, increased competition, and improved operational and energy efficiency." Pine Hill-Kingston Bus Corp., No. MC-2060 (Sub-No. 18), slip op. at 3 (June 6, 1983) (footnote omitted). These factors are among the central policy concerns inherent in the Act and amply support the ICC's general policy against restrictions. In fact, the Act allows bus companies to use an abbreviated proceeding before the ICC in order to have intermediate point restrictions "automatically" removed from its routes. See Sec. 10922(i)(4).
 
 
 34
 The ICC also concluded that enforcing the proposed restrictions would present significant administrative difficulties. The imposition of operating restrictions as a practical matter will inevitably prompt numerous claims of their violation. A volume of such complaints would dramatically increase the ICC's investigatory and decision making responsibilities. Thus, it was proper for the ICC to consider, as a part of its analysis, the Act's firm policy against restrictions and the fact that imposing them would result in administrative burdens.[3]
 
 
 35
 Hudson was also unable to convince the Commission that unrestricted grants of authority would have a significant adverse effect on commuter or small community service along the commuter corridor. Secs. 10101 and 10922(c)(3). The ICC viewed the evidence presented to prove this point as to speculative, apparently concluding that protestants' evidence was insufficient to permit an evaluation of the effect of the proposed service. The ICC also rejected Hudson's claims that the proposed routes would impair its ability to continue to serve its current routes. The Commission found that the protestant did not provide revenue or other figures that would substantiate such claims. The Act clearly provides that proof of diversion of traffic and passengers alone is not enough to demonstrate that the grant of authority is not consistent with the public interest. Sec. 10922(c)(3)(D). Rather, diversion could lead to "more quality and price options" for consumers and allow "the most productive use of equipment and energy resources." Pine Hill-Kingston Bus Corp., Nos. MC-2060 (Sub-No. 18), MC-2835 (Sub-No. 47), slip op. at 13 (June 11, 1984). The newcomer may force the existing carrier to provide service that is faster, cheaper, more comfortable or better meets the needs of the community in order to keep its market share.
 
 
 36
 We note that the present application seeking a new route which might merely divert traffic from an existing bus route is different from one under which a new route might force a protesting carrier to abandon its existing service to a large number of small communities. For example, a protesting carrier might show that the proposed service will duplicate only one or two of its profitable routes, causing it to lose a substantial number of passengers and profits. From this the protestant could present evidence to the ICC that because of the structure of its entire system, any diminution of its profits along the duplicated routes would adversely affect the service provided to smaller communities. Proof of this direct impact could be developed from statements filed by the parties, affidavits of those with knowledge of the proposed new service, interviews and surveys to demonstrate loss of passengers, financial records, public records regarding bus usage in the affected communities, media reports and the like. Thus, in this way a protestant could demonstrate to the ICC that the proposed diversion of traffic would significantly and materially jeopardize its ability to provide service to a substantial portion of its entire regular-route system. See Sec. 10922(c)(3)(D). At the same time, protestant might also demonstrate that the applicant's proposed service would result in no public benefit other than increased competition along the duplicated routes.
 
 
 37
 As discussed in Section I, although Congress's main goal was to promote competition, service to smaller communities and commuters was not thereby to be substantially diminished. The Act envisioned some trade-off between the interests in efficiency and in service. But Congress left it to the ICC to achieve a proper balance between these competing interests. When a protestant is able to present proof that the trade-off will result only in a heavy reduction of service to passengers in small communities or commuters with little corresponding public benefit, the ICC must adhere to the statutory purpose and deny the applicant's request to provide the proposed service. In sum, while protestant's burden of proof is difficult, it is not impossible. Here, the ICC concluded that this application did not present such an extreme case. The duplicative proposed routes in the present case account for about 35% of Hudson's regular-route revenue; the new routes do not simply duplicate one or two of Hudson's profitable routes. The records also indicate that the proposed duplication of service will be minimal, as the applicants are long-haul carriers that have never been engaged in commuter operations. Further, the proposed unrestricted routes are logical extensions of the applicants' existing upstate New York routes. It was, therefore, not arbitrary or capricious for the ICC to determine that the proposed service would make the applicants' operations more efficient, while its adverse impact on existing service would not be great. Thus, the ICC's decision adequately reconciled the conflicting interests Congress confided to it under the Act. Since the agency's decision was not arbitrary and capricious, it should not be disturbed.[4]
 
 
 38
 2. Whether the ICC Decision Was in Accordance With Law
 
 
 39
 Hudson vigorously attacks the Commission's actions. It charges that the ICC disregarded the public interest test and misapplied the statute, thereby acting contrary to law. None of its arguments warrants reversal.
 
 
 40
 First, Hudson argues that the ICC has imposed an impossible burden on it to prove that the proposed service is not consistent with the public interest. It complains that it is placed in the position of having to prove its case with evidence that, by its nature, is highly speculative. It is not the ICC, but the statute that placed this difficult burden on protestants' shoulders. Congress dramatically changed the entry requirements and created a regulatory scheme that emphasizes competition and efficiency. The proof that the ICC requires and the procedures it has established are appropriate in light of the Congressional aim.
 
 
 41
 Second, Hudson argues that the ICC has not dealt with these applications on a case-by-case basis, but rather has improperly engaged in master licensing. Unquestionable, the Act prohibits the ICC from engaging in so-called master licensing. Sec. 10922(c)(5) ("The Commission may not make any finding under paragraphs (1) and (2) of this subsection which is based upon general findings developed in rulemaking proceedings"). But Hudson has not presented enough evidence to persuade us that the ICC has disobeyed Congress' mandate. The Act is too new and the protestant's figures too insubstantial to conclude that the agency has engaged in prohibited master licensing.
 
 
 42
 Third, Hudson claims that the ICC must grant the proposed commuter operation restrictions because commuter service is the paramount consideration of the Act. It supports this view by citing sections of the Act that require the ICC to determine only whether the proposed service will have a significant adverse effect on commuter bus service. See Sec. 10922(c)(2)(A) (authority to operate on an intrastate route that is part of an interstate route); and Sec. 10922(i)(4) (removal of operating restrictions). The Act's language and Congress's purpose in enacting it belie this conclusion. As explained above, the ICC must balance the interests of both economic efficiency and flexibility of service. There is no indication that Congress favored the latter. To the contrary, the regulatory scheme is based on principles of competition and efficiency. Section 10922(c)(3) lists four interests that the ICC must consider. One of the four is the transportation policy of Sec. 10101, which includes fostering commuter operations. Sec. 10101(a)(2)(F). The ICC has great latitude to weigh the factors as it chooses. See Refrigerated Transport Co. v. ICC, 707 F.2d 497, 502-03 (11th Cir.1983); C & H Transportation Co. v. ICC, 704 F.2d 834, 847 (5th Cir.1983). And in those special cases that involve only the commuter operations test, the type of service applied for itself furthers the interests in competition and efficiency. Trailways, Inc. v. ICC, 727 F.2d 1284, 1290 (D.C.Cir.1984). Thus, the ICC need only look at the countervailing interest in fostering commuter operations to decide whether the certificate would be consistent with the public interest. Further, before rejecting the application in these special cases, the ICC must find the adverse effect on commuter service to be significant. In all these cases it is clear that Congress was willing to tolerate some diminution in commuter service in order to further competition.
 
 
 43
 Fourth, Hudson urges that because the applicants acquiesced in the imposition of operating restrictions, it was arbitrary for the ICC not to impose them. What this argument fails to recognize is that it is the Commission--not the parties--that is empowered to decide whether a proposed certificate is within the public interest. A reviewing court must give substantial deference to the agency's judgment. FCC v. WNCN Listeners Guild, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981). The ICC may authorize service greater than the carrier has proposed. Chicago, St. Paul, Minneapolis & Omaha Railway Co. v. United States, 322 U.S. 1, 4, 64 S.Ct. 842, 843, 88 L.Ed.2d 1093 (1944). Here the applicants proposed the restrictions only to "obviat[e] protestants' objections." Negotiations between the parties regarding restrictive amendments distort the Commission's analysis of the statutory standards and delay the proceeding. Such restrictions are inherently anticompetitive and inefficient. American Transfer & Storage Co., 719 F.2d at 1299-1300 (upholding ICC regulation prohibiting restrictive amendments to applications); see 49 C.F.R. Sec. 1160.79(b) ("Amendments to the application are not permitted").
 
 
 44
 Finally, Hudson urges that a number of earlier cases compel reversal in this case. It cites a number of decisions in which appeals courts have vacated ICC orders that granted trucking companies unrestricted authority to transport certain types of commodities in bulk form. See, e.g., Port Norris Express Co. v. ICC, 751 F.2d 1280 (D.C.Cir.1985); Port Norris Express Co. v. ICC, 746 F.2d 69 (D.C.Cir.1984); Erickson Transport Corp. v. ICC, 737 F.2d 775 (8th Cir.1984); Steere Tank Lines, Inc. v. ICC, 736 F.2d 1094 (5th Cir.1984); Port Norris Express Co. v. ICC, 729 F.2d 204 (3d Cir.1984). In each of these cases the trucking applicants had failed to carry their burden of proving that they were fit, willing, and able to provide the proposed transportation. 49 U.S.C. Sec. 10922(b)(1). The courts found that the applicants had not presented a bare minimum of proof to support a grant of authority to transport commodities in bulk. These cases are distinguishable from the present case. Here Hudson attacks the grants of authority to Pine Hill, Adirondack, and Fugazy on public interest grounds, and not on the basis that the applicants have failed to prove that they are fit, willing and able to perform. Hence, in the instant case it is the protestant, and not the applicant, who has failed to carry its burden of proof before the Commission. Moreover, the two statutes impose different standards of proof. See Sen. Rep., supra, at 15. A bus applicant, under the Bus Reform Act, need present only a bare minimum of evidence to prove that it is fit, willing, and able. See Sec. 10922(c)(6) and Sec. 10927(a)(1). An applicant under the Motor Carrier Act of 1980 must prove not only that it is fit, willing, and able, but also that the proposed service will "serve a useful public purpose, responsive to a public demand or need." 49 U.S.C. Sec. 10922(b)(1)(B). Similarly, in Cross-Sound Ferry Services, Inc. v. ICC, 738 F.2d 481 (D.C.Cir.1984), which involved a water common carrier application brought under 49 U.S.C. Sec. 10922(a), the court held that the applicant had failed to produce enough evidence to support the grant of authority. Thus, like the trucking cases, Cross-Sound Ferry did not involve the protestant's failure to prove that the proposed service was inconsistent with the public interest.
 
 
 45
 Hudson has also cited Pennsylvania Public Utility Commission v. United States, 749 F.2d 841 (D.C.Cir.1984) (PaPUC ). PaPUC involved an application under Sec. 10935 by a carrier to discontinue serving certain routes. The Court of Appeals for the District of Columbia affirmed the ICC orders granting discontinuance of 11 of the 12 routes in question. With regard to the other route, called Route 5-B, the court ruled, in granting a discontinuance, that the ICC had erroneously interpreted Sec. 10935(e)(1)(A) of the Act, a section not involved in the present appeal. Hudson correctly states that both PaPUC and the present case require the ICC to balance interests in efficiency against interests in promoting service to small communities. But unlike the application proceeding in the present case, granting a carrier the authority to discontinue service will not further any interests in competition. In fact, the carrier in PaPUC was unable, with respect to Route 5-B, to show that discontinuance would be more efficient, as it could not show, for that route, that its costs exceeded revenues.
 
 
 46
 Accordingly, we affirm the grants of authority issued to Pine Hill, Adirondack, and Fugazy, challenged in cases 83-4165, 83-4171, 84-4077, and 84-4079.
 
 III SPECIAL OPERATIONS
 
 47
 (Docket Nos. 84-4105 and 84-4107 )
 
 A. Background
 
 48
 The issue raised in this second set of cases is whether certain bus service to Atlantic City gambling casinos represents transportation in the nature of a special operation, as opposed to ordinary regular-route service. Protestant New Jersey Department of Transportation (NJDOT) contends that the proposed service constitutes special operations and, hence, is exempted from ICC jurisdiction under Sec. 10922(c)(2)(H).
 
 
 49
 C.L.D. Transportation Company (C.L.D.) applied under Sec. 10922(c)(1)(A) and (c)(2)(B) for a Certificate of Public Convenience and Necessity to operate between New York City and Atlantic City. C.L.D. proposed service to points along fixed routes on a regular schedule, stopping mainly in northeastern New Jersey. It intends to cooperate with the Atlantic City gambling casinos. Passengers will arrive at and depart from the casinos and will receive promotional gifts from the casinos, such as cash vouchers, food coupons, and show tickets. The casinos will provide much of the advertising for the bus service. As described above, Fugazy also applied for a similar New York City-Atlantic City route. Like C.L.D., Fugazy will cooperate with the gambling casinos and be part of their promotional activities.
 
 
 50
 NJDOT and a number of carriers filed protests. They charged that the proposed service was not consistent with the public interest and that it was in the nature of a special operation and therefore exempted from ICC jurisdiction under Sec. 10922(c)(2)(H). That section provides that paragraph (2) of section 10922(c) "shall not apply to any regular-route transportation of passengers provided entirely in one State which is in the nature of a special operation." Only this special operation issue is before us.
 
 
 51
 The Commission Review Board, Appellate Division, and the Commission uniformly rejected protestant's objection. The Board concluded that as the proposed services were not to include many of the more common features of special operations, such as meals or sightseeing, they could not be characterized as special operations. The Board stated that the carriers' proposed cooperation with the casinos' bonus incentive programs to passengers was not enough to place the service within the special operations exemption of the Act. C.L.D. Transportation Co., No. MC-146473 (Sub-No. 8) (June 7, 1983). In its final decision the ICC applied a balancing test to determine the applicability of the special operations exclusion. Although it acknowledged that the "service intended may include a feature of a special operation," the ICC held that "[a]s long as the operation is so clearly and predominantly a regular-route operation, we do not believe that 49 U.S.C. [Sec.] 10922(c)(2)(H) [precludes] it." C.L.D. Transportation Co., No. MC-146473 (Sub-No. 8), slip op. at 5 (Jan. 27, 1984). NJDOT sought review in the United States Court of Appeals for the Third Circuit, which, upon motion, transferred the appeal to this Court where it has been consolidated with the present action.
 
 B. Scope of Review
 
 52
 When a court reviews an ICC decision that purports to interpret an act, it must focus first on the statute's plain language and the purpose for its enactment. Here, the Commission is charged with the duty to administer the Bus Reform Act. Therefore, unless its actions are contrary to the clear aim of Congress, the Commission's interpretation of the Act is entitled to considerable deference. The Supreme Court recently stated the test to apply in such a case.
 
 
 53
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 54
 Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc., --- U.S. ----, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (footnotes omitted). Thus, when Congressional intent is unclear, the reviewing court's task is not to interpret the statute as it thinks best, but rather to pursue "the narrower inquiry into whether the Commission's construction was 'sufficiently reasonable' to be accepted by a reviewing court." Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981).
 
 C. Discussion
 
 55
 We turn to consider whether the ICC's decision in this case was sufficiently reasonable. "Special operations" encompasses many different types of services, such as door-to-door limousine service, day-trips to race tracks, gambling casinos, or sporting events, sightseeing tours, or similar excursions. Such service may include fixed routes and schedules, but must have, in addition, special characteristics that distinguish it from ordinary regular-route service. Whether a particular operation can be categorized as a special operation depends upon the characteristics of each operation and upon the surrounding circumstances. Transportation Activities of Brady Transfer and Storage Co., 47 M.C.C. 23, 52 (1947).
 
 
 56
 The language of the special operations exemption is quite broad. The ICC is without jurisdiction to issue a certificate if the proposed service is "in the nature of a special operation." Sec. 10922(c)(2)(H). The language does not require the ICC to categorize the service as a special as opposed to a regular-route operation. The ICC's task is merely to determine whether the elements of the proposed operations are characteristic of special operations.
 
 
 57
 The background and legislative history of the special operations exemption aid in its interpretation. New Jersey is the only state on the East Coast with legalized casino gambling. Unlike many commuter or small community bus operations, bus routes to Atlantic City are lucrative and in high demand. The State sought to control the allocation of the Atlantic City routes in order to be in a position to provide certain incentives to local carriers, thereby ensuring continued service to persons who reside in small communities or rely on commuter buses. Congress responded to this specific situation by adding the special operations exemption, which left special operations under the control of the State. While the legislative history on this single sentence provision is brief, it tellingly addresses the very point at issue in these cases.
 
 
 58
 In addition, the Commission should understand that any regular route transportation authorized under the provisions of paragraph (2) [of Sec. 10922(c) ] does not include authority to transport passengers in sightseeing or pleasure tours, in any tour service in which the passengers have a strong community of interest other than transportation, or in any other type of service normally characterized by the Commission as "special operations." For example, a carrier certificated under the provisions of paragraph (2) would not be authorized to transport passengers from a point in New Jersey to Atlantic City if such transportation included any element of the tour service typically offered to the patrons of gambling casinos.
 
 
 59
 H.R. No. 334, 97th Cong., 1st Sess. 35 (1981) (emphasis added). Therefore, when an applicant's proposed operation includes any element of service typically offered in these gambling casino excursions, it is "in the nature of a special operation," and not within the jurisdiction of the Commission.
 
 
 60
 In its final decision, the ICC concluded that it was "not possible to frame a restriction that excludes all aspects of a special operation from an intrastate regular-route certificate because some aspects, including scheduling, are present within every ordinary regular-route operation." C.L.D. Transportation Co., MC-146473 (Sub-No. 8), slip op. at 5 (Jan. 27, 1984). That statement demonstrates that the ICC improperly analyzed the exemption's focus. The exemption does not limit the ICC's jurisdiction with respect to those characteristics--such as fixed routes and schedules--that are typically included in both regular-route and special operations. Rather, it focuses on these elements of the operation that differentiate regular-route and special operations, such as point of destination and casino bonuses. When these special elements are present, the passengers take on a strong community of interest other than transportation and the service is properly characterized as being in the nature of a special operation.
 
 
 61
 Contrary to what Congress clearly planned, the ICC applied a balancing approach when it examined the characteristics of the proposed service to determine whether that service was "predominantly a regular-route or special operation." The Commission expressly found that C.L.D.'s and Fugazy's proposals included features of a special operation, but it did not deem those features substantial enough to bring the proposed service within the meaning of Sec. 10922(c)(2)(H). These "features" are the types of elements of service to which the House Report referred. The applicants intend to have considerable cooperation with the gambling casinos. To that end, they have agreed to discharge and pick-up passengers at the casinos, as opposed to the regular bus terminals. Passengers presumably will be met on the bus by a casino "greeter" and receive some form of bonus from the casino. The casinos will provide a significant part of the carriers' advertising. All of these are elements of a special operation and bring the proposed service within the compass of the special operation exemption.
 
 
 62
 Accordingly, the decisions of the ICC in cases 84-4105 and 84-4107 are vacated.
 
 
 
 [1]
 The jurisdictional provisions of the Act pertaining to motor carriers are contained in Subchapter II of Chapter 105 of Title 49, Secs. 10521-10529
 [The] Commission has jurisdiction over transportation by motor carrier ... to the extent that passengers, property, or both, are transported by motor carrier--
 (1) between a place in--
 (A) a State and a place in another State;
 (B) a State and another place in the same State through another State;
 (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
 (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
 (E) the United States and a place in a foreign country to the extent the transportation is in the United States.
 Sec. 10521(a)(1). In general, the ICC does not have jurisdiction over motor transportation entirely within one state, Secs. 10521(b) and 10525, or some narrowly-defined miscellaneous types of motor carrier transportation, Sec. 10526 (e.g., school buses and motor carriers operated by hotels or farmers).
 
 
 [2]
 "Commuter bus operations," as defined in Sec. 10102(5), means: short-haul regularly scheduled passenger service provided by motor vehicle in metropolitan and suburban areas, whether within or across the geographical boundaries of a State, and utilized primarily by passengers using reduced-fare, multiple-ride, or commutation tickets during morning and evening peak period operations
 
 
 [3]
 The ICC found that a restriction prohibiting the applicants from engaging in "commuter operations" would be difficult to interpret and enforce as that type of restriction was without precedent. The agency's argument that the Act prohibits "commuter operations" restrictions per se is unconvincing; the Act provides in Sec. 10102(5) a definition of "commuter bus operations" that could serve as the basis for such a restriction. See note 2 supra
 
 
 [4]
 The Commission also rejected Hudson's claims with respect to Pine Hill Route (4). First, ICC rules do not permit amendments to a service proposal once an application is filed. See 49 C.F.R. Sec. 1160.79(b). Second, in any event, the ICC's reasons set forth in support of granting the other proposed certificates amply support its conclusion to grant an unrestricted certificate for Route (4)