**ADVANCE–UNITED EXPRESSWAYS, INC., Debtor–In–Possession, Plaintiff,**

v.

**BEELER DISTRIBUTING CO., Defendant.**

**No. Civ–89–1694–A.**

United States District Court, W.D. Oklahoma.

Jan. 22, 1990.

Charles L. Broadway, Brown & Associates, Norman, Okl., for plaintiff.

David B. Schneider, Oklahoma City, Okl., for defendant.

## ORDER

ALLEY, District Judge.

The plaintiff Advance–United Expressways, Inc. (Advance–United) commenced this action in September 1989 seeking $5,525 in alleged undercharges, based on transportation services that it rendered to the defendant Beeler Distributing Company (Beeler) allegedly in its capacity as a motor common carrier. Presently, Advance–United moves the Court for summary judgement under the so-called filed rate doctrine. Beeler objects to the summary judgment motion and, for its part, moves the Court to stay the case and refer it to the Interstate Commerce Commission (ICC or Commission) under the doctrine of primary jurisdiction for a determination as to the alleged unreasonableness of Advance–United's undercharge action. For the reasons noted below, Advance–United's motion for summary judgment is *denied* and Beeler's motion for an ICC referral is *granted*. The case is stayed, but only for the limited purpose of permitting a determination by the ICC on the unreasonableness question.

### I.

For a growing number of courts, the factual setting of the instant case is familiar. Advance–United operated a trucking company (allegedly, as a motor common carrier) [1] that was subject to the regulatory

---

**1.** In responding to Advance–United's summary judgment motion, Beeler raises the possibility that Advance–United may have transported the goods in question, while operating as a motor contract carrier, which would render the Interstate Commerce Act's rate-filing requirement in-

jurisdiction of the ICC. During the years 1985–87, Advance–United transported goods for Beeler in interstate commerce, moving goods from Oklahoma to destinations outside the state. Advance–United billed Beeler for its transportation services at a specified rate and Beeler made payments at that rate. In September 1987, Advance–United declared bankruptcy. An audit of the company's freight charges ensued, and Advance–United allegedly discovered that it had undercharged Beeler. That is, Advance–United had allegedly charged Beeler for transporting its goods at rates that were lower than the rates Advance–United had filed in tariffs with the ICC. Advance–United demanded payment on the undercharges and Beeler failed to pay. According to Beeler, Advance–United was paid for the services it provided Beeler at agreed-on rates—rates arrived at through negotiations between Beeler and Advance–United—and Advance–United represented to Beeler that these agreed-on rates were legal rates filed in tariffs with the ICC.

### II.

Under Interstate Commerce Act, the ICC exercises regulatory jurisdiction over motor carriers transporting persons or property in interstate commerce. *See* 49 U.S.C. § 10521(a). Like other common carriers governed by the statute, motor common carriers generally can only provide transportation services at rates filed in effective tariffs with the ICC. *Id.* § 10761(a). Further, the statute expressly provides that such a carrier "may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff." *Id.* In requiring the rates of common carriers to be published in tariffs and fixed, Congress sought to eradicate the evil of kickbacks and other secret deals that discriminated in favor of large interstate shippers. *See, e.g., Carriers Traffic Serv., Inc. v. Anderson, Clayton & Co.*, 881 F.2d 475, 480 (7th Cir.1989); *West Coast Truck Lines, Inc. v. Arcata Community Recycling Center, Inc.*, 846 F.2d 1239, 1240 (9th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988). Articulated by the courts, the filed rate doctrine reflects Congress' expressed concern as to unjust discrimination.

■ Under the filed rate doctrine, "a carrier has not only the right but also the duty to recover its proper charges for services performed." *Southern Pacific Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 343, 102 S.Ct. 1815, 1820, 72 L.Ed.2d 114 (1982). In carrier actions of this type, it is well settled that courts are not permitted to entertain shippers' equitable defenses to recovery. *See, e.g., Western Transp. Co. v. Wilson & Co.*, 682 F.2d 1227, 1231 (7th Cir.1982); 13 Am. Jur.2d *Carriers* § 109 (1984). As the Supreme Court explained some seventy-five years ago:

> Under the interstate commerce act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, <u>unless it is found by the Commission to be unreasonable.</u> Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

*Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915) (emphasis added).

■ Yet, as suggested by the underscored language of *Maxwell, supra,* the Interstate Commerce Act also embodies a concern for reasonableness. The statute specifically provides that: "A rate ... or

---

applicable. *See Cent. & Southern Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301, 330 (D.C.Cir.1985), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985); 49 U.S.C. § 10761(b). Presumably, this factual issue (as well as other matters bearing on the existence of a negotiated rate) will be addressed by the ICC in arriving at its unreasonable practice determination, allowed by this Order.

practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission ... must be reasonable." 49 U.S.C. § 10701(a). If the ICC determines that the rate or practice of an interstate carrier is unreasonable, and therefore violates the statute, then the ICC is authorized to "prescribe the rate ... or practice to be followed." *Id.* § 10704(a)(1).

The ICC has articulated and recently clarified the purported scope of its statutory authority over unreasonable practices in the context of negotiated (but unfiled) rates of motor common carriers. *See National Industrial Transportation League—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates: Ex Parte No. MC–177*, slip op. (Oct. 14, 1986) (Def.'s Motion for Stay and Referral, App. A) [hereinafter *Negotiated Rates* I], *modified*, 1989 Fed.Carr.Cas. (CCH) ¶ 37,694 (June 14, 1989) [hereinafter *Negotiated Rates* II]. Generally, in *Negotiated Rates*, the ICC concluded that, in view of the high level of competition in the motor carrier industry and the relaxed regulatory environment engendered by the enactment of the Motor Carrier Act of 1980 (MCA),[2] it was appropriate for the ICC to consider in a limited number of cases shippers' defenses to the "rigid application of filed tariff rates." *Negotiated Rates* I, *supra*, at 6–7; *see Negotiated Rates* II, *supra*, ¶ 37,694.03, at 47,853 (stating that the *Negotiated Rates* policy "stems from our expert analysis of current regulatory and competitive conditions in the nation's motor carrier industry").

The ICC reasoned that in certain cases it was "fundamentally unfair" to permit a carrier to collect the full tariff rate (rather than the agreed-on rate), "especially where carrier actions may constitute fraudulent business practices." *Negotiated Rates* I, *supra*, at 5. The agency noted that its assertion of unreasonable practice authority in these cases furthered the national transportation policy, as amended by the MCA, that emphasized competition and efficiency in the motor carrier industry as a means of allowing for "a variety of quality and price options." 49 U.S.C. § 10101(a)(2)(B); *see Negotiated Rates* I, *supra*, at 7; *Negotiated Rates* II, *supra*, ¶ 37,694.03, at 47,853. According to the ICC, the "inflexible" application of the filed rate doctrine "could chill rate negotiation between shippers and carriers, and inhibit legitimate pricing initiatives." *Negotiated Rates* I, *supra*, at 7.

In *Negotiated Rates* I, the ICC indicated that, upon referral from a federal district court under the doctrine of primary jurisdiction, it was prepared to render an "advisory analysis," based on all the facts and circumstances of a given case, as to whether a carrier's undercharge action constituted a proscribed unreasonable practice. *Negotiated Rates* I, *supra*, at 8. The ICC noted that, "[c]onsistent with the statutory scheme," the referring court was free to accept or reject the agency's unreasonable practice determination. *Id.*

In *Negotiated Rates* II, the ICC purported to clarify the scope of its authority over unreasonable practices. The ICC noted that its use of the term "advisory" in describing its unreasonable practice determinations had been a "source of confusion" for certain courts and that it merited restating that the ICC possessed primary jurisdiction over unreasonable practice determinations. *Negotiated Rates* II, *supra*, ¶ 37,694.02, at 47,852. It followed from its primary jurisdiction, reasoned the ICC, that its determinations as to unreasonable practices were "binding and dispositive of the issue of the maximum reasonable compensation the carrier may receive for the transportation involved" and that such determinations were subject to review by the courts only under an arbitrary and capricious standard. *Id.* ¶ 37,694.01 Further, to highlight its primary jurisdiction and "proper role" in negotiated rate controver-

---

2. The MCA ushered in an "era of deregulation." *West Coast Truck Lines v. Arcata Community Recycling Center, Inc.*, 846 F.2d 1239, 1245 (9th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988). In enacting this statute, Congress adopted "an approach emphasizing market discipline, in contrast to public utility-style ratemaking, as the principal regulator of motor carriers." *Cent. & Southern Motor Freight Tariff Ass'n*, 757 F.2d at 311.

sies, the ICC announced that it would entertain and rule on petitions for unreasonable practice determinations, even absent a referral from district courts. *Id.* ¶ 37,694.03, at 47,857.

## III.

The filed rate doctrine (derived from 49 U.S.C. § 10761(a)) and the ICC's asserted authority over unreasonable practices "unquestionably exist in a tension of sorts." *Carriers Traffic Serv.*, 881 F.2d at 482 n. 6. The tension is evident in the conflicting relief requested by the parties. And, the tension is evident in the case law, where courts have disagreed as to the appropriate treatment to accord to shippers' unreasonable practice allegations in undercharge actions similar to the case at bar. *See In re Suburban Motor Freight, Inc.*, 103 B.R. 888, 890–91 (Bankr.S.D.Ohio 1989) (collecting cases).

There are two principle questions at issue: (1) whether the Court is required to make an ICC referral for an unreasonable practice determination as to Advance–United's undercharge action under the principle of primary jurisdiction; and (2) whether the ICC's asserted authority over unreasonable practices expressed in its *Negotiated Rates* policy is tenable in view of the filed rate doctrine and section 10761(a). In general terms, these questions are presently before the Supreme Court. *See Maislin Industries v. Primary Steel, Inc.*, 879 F.2d 400 (8th Cir.1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 834, 107 L.Ed.2d 830 (1990); *see also* Brief for the Federal Respondent, at I (filed as to petition for certiorari—*Maislin Industries*) [hereinafter *Maislin* Brief]; Brief for the United States as Amicus Curiae, at I (filed as to petition for certiorari No. 88–1958—*In re Caravan Refrigerated Cargo, Inc.*, 864 F.2d 388 (5th Cir.1989)). However, the parties are entitled to a ruling now: determination of these two questions shall not be stayed pending a decision by the Supreme Court.

### A.

The primary jurisdiction doctrine arises from a judicial concern as to the maintenance of the proper balance of decision-making responsibilities between the courts and administrative agencies. While a claim may be appropriately raised in the first instance in a judicial forum, the adjudication of the claim may require "the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pacific R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

In determining what issues fall within the special competence of administrative agencies and thus require referral, courts focus on "the character of the controverted question and the nature of the inquiry necessary for its solution." *Great Northern R. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922). If the question is purely one of law, it is the principle concern of the courts. *See Great Northern R.*, 259 U.S. at 291, 294, 42 S.Ct. at 479, 480; *Louisville & Nashville R. Co. v. F.W. Cook Brewing Co.*, 223 U.S. 70, 83–84, 32 S.Ct. 189, 191–192, 56 L.Ed. 355 (1912); *see also* 13 Am. Jur.2d *Carriers* § 58 (noting that it is "firmly established" that questions of "general law" are not deemed administrative matters). On the other hand, if the question presents largely fact-based matters for resolution where expert knowledge of the regulated industry is of material assistance, then the question should be considered one of administrative competence and taken up by the agency upon referral under the doctrine of primary jurisdiction. *See, e.g., Western Pacific R.*, 352 U.S. at 65, 77 S.Ct. at 165; *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494–95, 96 L.Ed. 576 (1952); *Zapp v. United Transp. Union*, 727 F.2d 617, 625 (7th Cir.1984).

Traditionally, courts have ruled that the inquiry as to the alleged unreasonableness of carrier rates or practices is a matter properly left to the ICC under the doctrine of primary jurisdiction. *See Nader v.*

*Allegheny Airlines, Inc.,* 426 U.S. 290, 304–05, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976); *Hewitt–Robins, Inc. v. Eastern Freight–Ways, Inc.,* 371 U.S. 84, 87, 83 S.Ct. 157, 159, 9 L.Ed.2d 142 (1962); *Northern Pacific R. v. Solum,* 247 U.S. 477, 483, 38 S.Ct. 550, 552, 62 L.Ed. 1221 (1918); *see also Western Transp.,* 682 F.2d at 1232 (holding that: "[T]he district court did not have the power to declare the [billing notation] requirement unreasonable. Only the ICC can do that. . . ."). In the context of motor carrier undercharge actions like the case at bar, the majority of federal courts have apparently elected to adhere to this tradition—that is, they have opted to refer the unreasonable practice question to the ICC. *See Maislin Industries,* 879 F.2d at 403; *In re Suburban Motor Freight, Inc.,* 103 B.R. at 891; *cf. Seaboard System R.R. v. United States,* 794 F.2d 635, 638 (11th Cir.1986) (railroad carrier undercharge action).

The Court concludes that the majority approach favoring referral is sound and should be adopted here. The ICC's unreasonable practice determinations require "inherently factual inquiries." *INF, Ltd. v. Spectro Alloys Corp.,* 881 F.2d 546, 549 (8th Cir.1989), *petition for certiorari filed,* No. 89–936 (Dec. 14, 1989); *see Dependable Cartage & Transp. Co. v. Sovereign Oil,* No. 84 C 4949 (N.D.Ill. Oct. 26, 1989) (available on WESTLAW, 1989 WL 135216); *cf. Carriers Traffic Service,* 881 F.2d at 478 n. 4 (noting on related facts that the ICC's unreasonable practice determinations require a "particularist, fact-bound inquiry"). The ICC must establish whether a carrier has participated in a course of conduct including:

> (1) negotiating a rate; (2) agreeing to a rate that the shipper reasonably relies upon as being lawfully filed; (3) failing, either willfully or otherwise, to publish the rate; (4) billing and accepting payment at the negotiated rate for (sometimes) numerous shipments; and (5) then demanding additional payment at higher rates.

*Negotiated Rates II, supra,* ¶ 37,694.03, at 47,853 n. 11.

There is, to be sure, a contract-law aspect familiar to courts in certain of these factual inquiries (*e.g.,* offer and acceptance as to the negotiated rate). *See Zidell Explorations,* 1989 Fed.Carr.Cas. (CCH) ¶ 37,657 (Feb. 16, 1989), *enforced, Motor Carrier Audit & Collection Co. v. Zidell Explorations, Inc.,* No. 87–C–52–E (N.D. Okla. July 27, 1989); *Negotiated Rates II, supra,* ¶ 37,694.03, at 47,853. Yet, in arriving at an unreasonable practice determination, not only must the decision maker unearth the relevant facts but, also, weigh the significance of those facts; clearly this weighing function "could be facilitated by an informed evaluation of the economics or technology of the regulated industry." *Nader,* 426 U.S. at 305, 96 S.Ct. at 1987; *see Northern Pacific R.,* 247 U.S. at 482–83, 38 S.Ct. at 552–53; *Negotiated Rates II, supra,* ¶ 37,394.03, at 47,853. Accordingly, as to motor carrier undercharge actions like the case at bar, unreasonable practice determinations are better left to the ICC.

### B.

■ The question here is whether the ICC's unreasonable practice authority as articulated in *Negotiated Rates* I and II may be sustained in view of the filed rate doctrine and 49 U.S.C. § 10761(a). The Court responds in the affirmative.

The Court finds initially that *Maxwell, supra,* and its progeny do not bar the ICC's asserted unreasonable practice authority, for these cases only address the authority of courts to entertain equitable defenses to carrier undercharge actions; they "never said that the *Commission* could not determine whether a carrier's solicitation, publication and billing practices are unreasonable." *Negotiated Rates II, supra,* ¶ 37,694.03, at 47,853; *see Seaboard System R.R.,* 794 F.2d at 638.

The ICC's unreasonable practice authority is derived from the express terms of the Interstate Commerce Act. As noted, section 10701(a) specifically provides that carrier practices "must be reasonable." 49 U.S.C. § 10701(a). Nothing in the statute relegates section 10701(a) to second-class

status; accordingly, it stands on an equal footing with section 10761(a). *See Maislin Industries,* 879 F.2d at 405; *Negotiated Rates* II, *supra,* ¶ 37,694.03, at 47,853. The Court cannot blithely elect to enforce one provision over the other. Sections 10701(a) and 10761(a) must be harmonized in light of the policies animating the statute as a whole. *See Maislin Industries,* 879 F.2d at 405; *Seaboard System R.R.,* 794 F.2d at 638; *see also West Coast Truck Lines,* 846 F.2d at 1242 (looking to the policies of the statute in construing 49 U.S.C. § 10733). And, as the agency charged with administering the statutory scheme, the ICC is the most appropriate entity to undertake this task. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Maislin,* 879 F.2d at 405; *Hudson Transit Lines v. United States, ICC,* 765 F.2d 329, 336 (2d Cir.1985).

In this regard, the ICC has concluded that in those "clear instances of carrier negotiated rates abuses" where the ICC adjudges carrier practices to be unreasonable, the filed rate doctrine simply does not apply. *Negotiated Rates* II, *supra,* ¶ 37,694.03, at 47,855; *see Maislin Industries,* 879 F.2d at 405. This result is in accord with *Maxwell,* as there the Supreme Court ruled that a rate on file is inviolable "unless it is found by the Commission to be unreasonable." 237 U.S. at 97, 35 S.Ct. at 495; *cf. Arizona Grocery v. A.T. S.F. R. Co.,* 284 U.S. 370, 384, 52 S.Ct. 183, 184, 76 L.Ed. 348 (1932) (noting that the legal or filed rate is "lawful" only if it is reasonable); *Maislin* Brief, *supra,* at 7 (noting *Maxwell*'s "important qualification" as to the filed rate doctrine). Moreover, the ICC's construction of the statute does not relieve carriers of their obligation to file rates nor does it establish a general rule that negotiated rates should prevail over filed rates in undercharge actions. In a reasonable manner, the ICC has "render[ed] the statutory design effective in terms of the policies behind its enactment," and, accordingly, its construction of the statute should not be disturbed. *National Petroleum Refiners Ass'n v. FTC,* 482 F.2d 672, 689 (D.C.Cir.1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).

### IV.

In sum, the Court concludes that: (1) the determination as to whether Advance–United's undercharge action constitutes an unreasonable practice is a matter best left to the ICC under the doctrine of primary jurisdiction; and (2) the ICC's assertion of unreasonable practice authority in the context of negotiated (but unfiled) motor carrier rates is compatible with the filed rate doctrine and 49 U.S.C. § 10761(a). Accordingly, Beeler's motion for an ICC referral is granted and the case is stayed pending the agency's ruling. Advance–United's summary judgment motion is denied; at best, it is premature.