Stephen F. REDDY and John W. Sorkvist, Petitioners,

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

Solomon Mayer, Barry Mayer, SHB Commodities, Inc., Maye Commodities Corp., and Steven Gelbstein, Petitioners,

v.

**Commodity Futures Trading Commission, Respondent.**

**Docket Nos. 98–4070, 98–4071, 98–4099, 98–4100**

United States Court of Appeals, Second Circuit.

Argued: July 17, 1998

Decided: Sept. 03, 1999

J. Douglas Richards, Deputy General Counsel, Commodity Futures Trading Commission, Washington, D.C. (Daniel R. Waldman, General Counsel; Laura M. Richards, Assistant General Counsel; Janene M. Smith, Susan W. Nathan, Michael J. Garawski, Beth G. Pacella, Attorneys; of counsel), for Respondent.

Micheal T. Tomaino, JR., Sullivan & Cromwell, New York, New York (Kenneth M. Raisler, of counsel), for Petitioner John W. Sorkvist.

Benjamin J. Golub, Rogovin Golub Bernstein & Wexler, LLP, New York, New York, for Petitioner Stephen F. Reddy.

Kenneth M. Raisler, Sullivan & Cromwell, New York, New York (Michael T. Tomaino, Jr., Michael W. Martin, of counsel), for Petitioners Solomon Mayer, Barry Mayer, SHB Commodities, Inc., and Maye Commodities Corp.

Gary D. Stumpp, Stumpp & Bond, LLP, New York, New York (Adam M. Bond, of counsel), for Petitioner Steven Gelbstein.

Audrey R. Hirschfeld, Senior Vice President/General Counsel, Coffee, Sugar & Cocoa Exchange, Inc., New York, New York, for Amicus Curiae Coffee, Sugar & Cocoa Exchange, Inc.

Martin I. Kaminsky, Pollack & Kaminsky, New York, New York (W. Hans Kobelt, of counsel), for Amicus Curiae New York Mercantile Exchange.

Before: WINTER, Chief Judge, DORSEY,* and JONES,** District Judges.

WINTER, Chief Judge:

Steven F. Reddy and John W. Sorkvist petition for review of an order of the Commodity Futures Trading Commission which found them guilty of several violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1–26, and imposed various sanctions.[1] *See In re Reddy*, No. 92–19, Comm. Fut. L. Rep. (CCH), ¶ 27,-271, 1998 WL 44574 (C.F.T.C. Feb. 4, 1998). Solomon Mayer ("SMayer"), Barry Mayer ("BMayer"), SHB Commodities, Inc. ("SHB"), Maye Commodities Corp. ("MCC"), and Steven Gelbstein petition for review of a similar order. *See In re Mayer*, No. 92–21, 1998 WL 80513 (C.F.T.C. Feb. 25, 1998). Because of the similarity of issues, we heard these petitions together. We hold that the weight of the evidence supports the Commission's liability findings in both proceedings and that the Commission adequately explained the basis for the sanctions imposed. We therefore deny the petitions for review.

## BACKGROUND

a) *In re Reddy*

In April 1992, the Enforcement Division of the Commission ("Division") filed an eight-count complaint against petitioners Reddy and Sorkvist, along with two other traders, accusing them of multiple violations of the CEA and the Commission's Rules in connection with their trading activities in the sugar pit of the Coffee, Sugar & Cocoa Exchange ("CSCE"). The complaint alleged that from June 29 through October 31, 1988, and during March 1989, Reddy and Sorkvist—both "dual traders"[2]—had engaged in fraudulent executions of customer orders and had accommodated each other in such transac-

---

* The Hon. Peter C. Dorsey, of the United States District Court for the District of Connecticut, sitting by designation.

** The Honorable Barbara S. Jones, of the United States District Court for the Southern District of New York, sitting by designation.

1. Pursuant to 28 U.S.C. § 46(b) and an order of the Chief Judge of this Court certifying a judicial emergency, this case was heard by a panel consisting of the Chief Judge of this Court and two judges of the United States District Court sitting by designation.

2. "Dual traders" are "floor brokers" who trade for customers and for their own accounts. A floor broker is "any person who, in

or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged, purchases or sells for any other person any commodity for future delivery on or subject to the rules of any contract market." 7 U.S.C. § 1a(8). A "floor trader" is "any person who, in or surrounding any pit, ring, post, or other place provided by a contract market for the meeting of persons similarly engaged, purchases or sells solely for such person's own account, any commodity for future delivery on or subject to the rules of any contract market." 7 U.S.C. § 1a(9).

tions. Specifically, the complaint alleged that Reddy had engaged in 35 trade-practice violations, including indirect "bucketing" of customers' orders and "wash trades." The complaint also alleged that Sorkvist had engaged in 19 trade-practice violations, primarily "accommodation" trades.

■ A broker buckets a customer's order by trading opposite the order for the broker's own account or for an account in which the broker has an interest. "Indirect bucketing" occurs when a broker, aided by an accommodating trader, trades opposite his own customer while appearing to trade opposite the accommodator.[3] *See CFTC Glossary: A Layman's Guide to the Language of the Futures Industry* 4 (1997). For example, if a customer directs a broker to buy five contracts, the broker can trade against the customer by buying the five contracts for the customer from a trader while selling five identical contracts from the broker's personal account to the same trader. A broker can profit from bucketing by obtaining a better price than available through open outcry or by trading ahead of the customer and reaping the difference between the price of the early trade and the predetermined price for the customer.

■ A wash trade is a transaction made · without an intent to take a genuine, *bona fide* position in the market, such as a simultaneous purchase and sale designed to negate each other so that there is no change in financial position. *See Sundheimer,* 688 F.2d at 152; *CFTC v. Savage,* 611 F.2d 270, 284 (9th Cir.1979); *CFTC Glossary, supra,* at 1. Wash trades may be used, *inter alia,* to avoid margin requirements, to rearrange gains and loss for tax purposes, or to manipulate prices. *See* Charles R.P. Pouncy, *The Scienter Requirement and Wash Trading in Commodity Futures: The Knowledge Lost in Knowing,* 16 Cardozo L.Rev. 1625, 1637 (1995).

■ On November 2, 1995, the Administrative Law Judge ("ALJ") found Reddy liable for CEA violations in 35 trade sequences and Sorkvist liable in 16 trade sequences. *See In re Reddy,* No. 92–19, Comm. Fut. L. Rep. (CCH) ¶ 26,544, 1995 WL 646200, at *58–*60 (C.F.T.C. Nov. 2, 1995).[4] Based on these findings, the ALJ imposed the following sanctions: cease and desist orders against both petitioners; revocation of their floor broker registrations; imposition of a ten-year trading ban on Reddy and a five-year trading ban on Sorkvist; and a $300,000 civil penalty on Reddy and a $150,000 penalty on Sorkvist. On February 4, 1998, the Commission affirmed both the ALJ's liability findings and the imposition of sanctions.

b) *In re Mayer*

In April 1992, petitioners SMayer, BMayer, SHB, MCC, and Gelbstein were, along with other traders, charged in a 23–count complaint of multiple recordkeeping and trade practice violations in connection

---

**3.** An "accommodator" is a trader who enters into noncompetitive trading to assist others with illegal trades. *See Sundheimer v. CFTC,* 688 F.2d 150, 152 (2d Cir.1982) (" '[A]ccommodation trading' [i]s '(w)ash trading entered into by a trader, usually to assist another with illegal trades....' ").

**4.** Specifically, the ALJ found that Reddy had violated Section 4b(A) of the CEA, which prohibits cheating and defrauding in connection with commodity futures contracts; Section 4b(B) of the CEA, which prohibits the entering of false records; Section 4b(C) of the CEA, which prohibits deception in connection with the execution of orders for futures con-

tracts; Section 4b(D) of the CEA, which prohibits the bucketing of customer orders and the filling of customer orders by offset; Section 138(a) of the Commission Rules, 17 C.F.R. § 1.38(a), which prohibits noncompetitive trading; Section 4c(a)(A) of the CEA, which prohibits wash sales, fictitious sales, and accommodation trades; and Section 4c(a)(B) of the CEA, which prohibits the causing of prices that are not true or *bona fide* to be reported, registered, or recorded. It also found that Sorkvist had violated Sections 4b(A), 4b(C), 4b(D), 4c(a)(A), and 4c(a)(B) of the CEA as well as Section 1.38(a) of the Commission Rules.

with futures trading in the heating oil pit of the New York Mercantile Exchange ("NYMEX") from 1987 through mid–1989. With respect to the trade practice violations, the complaint alleged that: (i) SMayer, BMayer, SHB, and MCC knowingly engaged in noncompetitive trades to achieve wash results by trading the SHB and MCC accounts opposite each other ("Schedule A trades"); (ii) SMayer, SHB, and MCC knowingly engaged in noncompetitive trades and Gelbstein accommodated them ("Schedule B trades"); (iii) SMayer bucketed his customers' orders and Gelbstein accommodated him ("Schedule C trades"); and (iv) SMayer bucketed his customers' orders and Gelbstein accommodated him ("Schedule D trades").

On May 15, 1996, the ALJ found petitioners liable on 22 of the 23 counts alleged in the complaint[5] and imposed sanctions. SMayer, BMayer, SHB, MCC, and Gelbstein were ordered to cease and desist from violating the CEA and the Commission's Rules; the registrations of SMayer, BMayer, and SHB were revoked; SMayer, BMayer, and SHB were prohibited from trading on, or subject to the rules of, any contract market for five years; Gelbstein was prohibited from doing the same for 30 days; and a civil monetary penalty of $200,000 was assessed against SMayer, $100,000 each against BMayer, SHB, and MCC, and $25,000 against Gelbstein. *See In re Mayer*, No. 92–21, Comm. Fut. L. Rep. (CCH) ¶ 26,736, 1996 WL 271177, at *23 (C.F.T.C. May 15, 1996).

Petitioners appealed the ALJ's decision to the Commission. The Division did not seek an increase in the sanctions imposed by the ALJ. On February 3, 1998, the Commission issued an opinion and order ("Original Order"), in part affirming, vacating, and modifying the ALJ's decision. In particular, the Commission *sua sponte* increased the sanctions imposed by the ALJ pursuant to a policy of reviewing sanctions *de novo* that was adopted several months after the ALJ's decision and petitioners' appeals to the Commission. *See In re Grossfeld*, No. 89–23, Comm. Fut. L. Rep. (CCH) ¶ 26,921, 1996 WL 709219, at *11 (C.F.T.C. Dec. 10, 1996) ("[I]n this case and in the future we will determine sanctions de novo rather than defer to the assessment of Commission ALJs").

Shortly thereafter, it was brought to the Commission's attention that it had erroneously found BMayer and Gelbstein liable for fraud under Section 4b of the CEA even though the complaint contained no such charges. The Commission vacated its Original Order and issued an amended opinion and order ("Amended Order") on February 25, 1998, correcting the error and altering some of the sanctions it had imposed.[6] Specifically, the Amended Order affirmed the ALJ's imposition of cease and desist orders against all petitioners and affirmed the revocation of SMayer's, BMayer's, and SHB's registrations. Instead of the five-year trading ban imposed by the ALJ on SMayer and SHB, however, the Commission permanently banned them from trading. It also ordered a permanent trading ban against MCC, although the ALJ had imposed no ban. And, instead of the five-year trading ban imposed

---

**5.** The ALJ found that SMayer had violated CEA §§ 4b(A), 4b(D), 4c(a)(A), 4c(a)(B), and 4g(1) and Commission Rules §§ 1.31(a), 1.35(d), 1.38(a), and 166.3; that SHB had violated CEA §§ 4b(A), 4b(D), 4c(a)(A), 4c(a)(B), and 4g(1) and Commission Rules §§ 1.38(a) and 166.3; that MCC had violated CEA §§ 4b(A), 4b(D), 4c(a)(A), and 4c(a)(B) and Commission Rule § 1.38(a); that BMayer had violated CEA §§ 4c(a)(A), 4c(a)(B), and 4g(1) and Commission Rules §§ 1.31(a), 1.35(d), and 1.38(a); and that Gelbstein had violated CEA §§ 4c(a)(A) and 4c(a)(B) and

Commission Rules §§ 1.31(a), 1.35(d), and 1.38(a).

**6.** The Amended Order deleted the fraud findings against BMayer and Gelbstein and reduced the increased penalties against them from $250,000 to $150,000 each. However, it retained the increased trading bans. The Amended Order also reduced, without explanation, the number of alleged Schedule C and D violations by SHB and MCC from 571 to 394. It did not, however, reduce the sanctions against either SHB or MCC.

by the ALJ on BMayer and the thirty-day ban imposed upon Gelbstein, the Commission imposed ten-year bans upon each of them. Finally, the Commission assessed civil penalties of $500,000 against SMayer, $250,000 each against SHB and MCC, and $150,000 each against BMayer and Gelbstein.

## DISCUSSION

a) *Liability*

1) Standard of Review

■ The Commission's liability findings are conclusive if supported by the weight—or preponderance—of the evidence. *See* 7 U.S.C. § 9; *Haltmier v. CFTC,* 554 F.2d 556, 560 (2d Cir.1977); *see also Dohmen–Ramirez v. CFTC,* 837 F.2d 847, 856 (9th Cir.1988). However, our role in reviewing the Commission finding of preponderance is narrow. We will not "mechanically reweigh[ ] the evidence to ascertain in which direction it preponderates...." *Haltmier,* 554 F.2d at 560. Rather, we review the record only for the "purpose of determining whether the finder of [ ] fact was justified, *i.e.,* acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported [its] findings." *Id.; cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42–43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (scope of review under arbitrary and capricious standard is narrow and court is "not to substitute its judgment for that of the agency"); *Atlantic Tele–Network, Inc. v. FCC,* 59 F.3d 1384, 1389 (D.C.Cir.1995) (court's duty is merely to ensure that agency has examined relevant data and articulated satisfactory explanation of its action based on record before it). With this standard of review in mind, we turn to an examination of petitioners' claims.

2) Reddy and Sorkvist

■ With regard to Reddy and Sorkvist, the evidence was as follows. The Division's expert, Martha Kozlowski, examined thousands of trading cards and identified transactions in which a broker had simultaneously bought and sold identical sugar futures contracts in identical, or nearly so, quantities at or about the same price opposite the same trader. In the transactions pertinent to Reddy and Sorkvist, the broker's trades were both for a customer and for the broker's personal account. The accommodating trader bought and sold only for his personal account.

Kozlowski testified that trading with those characteristics—principally simultaneous trades of the same contracts, at the same price, in the same quantity, and between the same broker and trader—is unlikely to occur in a competitive open outcry. In her view, such trades exhibited the characteristics of indirect bucketing.

Petitioners countered this evidence with expert and other testimony that such trading configurations can just as plausibly involve lawful dual trading, in particular a practice known as "scalping." Scalping involves the buying and selling of the same contracts within a very short period of time on small market fluctuations, and sometimes, if the attempt to profit fails, buying and selling at the same price. *See In re Collins,* No. 77–15, Comm. Fut. L. Rep. (CCH) (C.F.T.C. Nov. 26, 1986) ¶ 22,-401, 1986 WL 289309, at *1, *3 n. 1. ("The fact that the scalper liquidated with such a result does not raise an inference that he intended to avoid a *bona fide* market position if, when the transaction was initiated, his intention was to profit from the free play of market forces."). Based on the existence of lawful practices that might result in similar trading configurations, petitioners argue that the evidence against them is no better than in equipoise and cannot as a matter of law support a more-probably-than-not finding of a violation. We disagree.

The Commission had a not unreasonable skepticism about viewing the transactions in question as lawful, in particular viewing them merely as unsuccessful attempts at scalping in which the broker was happy to break even. The Commission noted that the transactions occurred when the market was unusually volatile and the immediate turn-arounds prevented any hope of gain as well as avoiding any loss. It found such risk-adverseness implausible. The Commission also noted that some of the trades occurred early in the day and were therefore not designed to end the day without margin fees. Finally, it found that "not all of the traders in the alleged sequences were scalpers unable or unwilling to establish or hold a position." *Reddy*, 1998 WL 44574, at *10.

Moreover, the trade sequences described all were accompanied by "audit trail irregularities." Petitioners were required to record the terms and times of trades on trading cards. The cards reflecting the trades described above showed two kinds of irregularities in particular. First, some cards showed sequencing irregularities; e.g., the broker and accommodating trader each recorded the first transaction as a buy and the second as a sell, a clear misdescription of the transaction. Second, other cards showed that both the broker and trader subsequently altered the quantity first recorded by identical amounts. In the Commission's not implausible view, these alterations reflected the number of contracts traded on the broker's own behalf. Both the sequencing irregularities and the mutual alteration of quantities are, in the context of trades with the characteristics described above, strong evidence of artificial trading.

Given the evidence, we cannot overturn the Commission's finding of liability. It is true that "the Division must do more than present suspicious circumstances raising the possibility of knowing wrongdoing," *In re Rosenberg*, No. 80–29, Comm. Fut. L. Rep. (CCH) ¶ 24,992, 1991 WL 83516, at *4 (C.F.T.C. Jan. 25, 1991), and that the Com-

mission's "role is to separate what 'could have happened' from 'what the preponderance of the evidence shows most likely did happen.'" *In re Gilchrist*, No. 83–58, Comm. Fut. L. Rep. (CCH) ¶ 24,993, 1991 WL 83518, at *6 (C.F.T.C. Jan. 25, 1991) (quoting *In re Citadel Trading Co.*, [1986–1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,082, at 32,190 (C.F.T.C. May 12, 1986)). It is also true that conduct as consistent with permissible competition as with unlawful trading does not, without more, support an inference of illegal conduct. *See United States v. Gigante*, 39 F.3d 42, 47 (2d Cir.1994) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses."), *amended*, 94 F.3d 53 (2d Cir.1996); *In re Bear Stearns & Co.*, No. 80–31, Comm. Fut. L. Rep. (CCH) ¶ 24,994, 1991 WL 83520, at *12, *17 n. 20 (C.F.T.C. Jan. 25, 1991) ("[A] respondent will prevail if his explanation is as plausible as that offered by the Division."). However, as stated earlier, it is not our task to reweigh the evidence "to ascertain in which direction it preponderates." *Haltmier*, 554 F.2d at 560. As long as the Commission acted reasonably "in concluding that the evidence ... supported [its] findings," we will not disturb its factual determinations. *Id.*

To be sure, the evidence here is circumstantial, but circumstantial evidence is often all that is available in cases involving artificial trading. *See, e.g., In re Buckwalter*, No. 80–28, Comm. Fut. L. Rep. ¶ 24,995, 1991 WL 83522, at *20 (C.F.T.C. Jan. 25, 1991). Moreover, even in criminal cases, circumstantial evidence is "not a disfavored form of proof." *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir.1994). In the instant matter, the Commission reasonably concluded that the trades at issue were illegal based on their unusual no-profit-or-loss nature, the implausibility of petitioners' scalping theory, and the accompanying audit trail irregularities. Nothing proffered by the petitioners re-

motely suffices to negate that evidence as a matter of law.[7]

 Sorkvist, whose only proven roles were as a money-passer or accommodating trader, argues that the Division failed to establish that he had a motive to participate in noncompetitive trading and thereby failed to prove scienter. He correctly argues that proof of participation in noncompetitive trades alone is not a sufficient basis for inferring knowing participation in trades. *See Gilchrist*, 1991 WL 83518, at *7. However, Sorkvist confuses intent with motive.

 It is true that the Division must prove intent to establish a violation of either Section 4b or 4c of the CEA. *See CFTC v. Savage*, 611 F.2d at 284 ("One cannot have an 'accommodation' sale or a 'fictitious' transaction if one in fact believes he is bargaining faithfully and intends to effect a *bona fide* trade."); *Buckwalter*, 1991 WL 83522, at *21–*22 (in trade practice case, beyond proof of suspect conduct, Division must prove that respondent's participation in it was knowing). However, scienter may be inferred from circumstantial evidence, *see Buckwalter*, 1991 WL 83522, at *20–*21, and from evidence other than motive. Although evidence of motive strengthens an inference of intent, *see id.* at *21, motive is not an essential element of a trade practice offense. *See United States v. Bagaric*, 706 F.2d 42, 53 (2d Cir.1983) ("[M]otive itself is not generally an element of a particular offense."), *abrogated by National Org. of Women v. Scheidler*, 510 U.S. 249, 260–61, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (holding that economic motive not required for RICO violation); *Gilchrist*, 1991 WL 83518, at *7 (absence of motive evidence did not preclude ALJ from concluding that some or all of participants had knowingly engaged in unlawful trading practices).

In holding Sorkvist liable, the Commission did not improperly rely solely "upon its theory of systematic fraud as a substitute for specific evidence that [Sorkvist] knew in what. capacity an opposite broker was trading." *Rosenberg*, 1991 WL 83516, at *5. In addition to the evidence of a recurring pattern of noncompetitive trading, the audit trail irregularities suggested artificial trading in every trade sequence for which charges were brought. These irregularities, in conjunction with the suspicious pattern of trading, are highly probative evidence that Sorkvist knowingly assisted others in illegal transactions. The Commission's determination that "the circumstances surrounding the suspicious patterns rebutted any suggestion that the transactions could have occurred in the normal course of trading without collusion," *Reddy*, 1998 WL 44574, at *12, was not, therefore, unreasonable.

Reddy also claims that he was denied an impartial trial because the ALJ was biased. He relies on a gratuitous critique by the ALJ of floor trading practices, the ALJ's crediting of Kozlowski's analysis over that of his own expert, and the ALJ's alleged refusal to permit meaningful cross-examination by Reddy's counsel. The claim is meritless.

 Whether a trier is impartial depends upon whether there was either an extrajudicial source of bias or a bias that demonstrates "a deep-seated favoritism or antagonism that would make [a] fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *see also Olson v. Ulmer*, No. 87–R46, Comm. Fut. L. Rep.

---

7. Sorkvist argues that the Commission's order should be overturned because it applied the wrong standard in determining that the Division met its burden of proof. He contends that, instead of a "more likely than not" standard, the Commission applied a "more than coincidental" test of liability. To be sure, in finding that petitioners' explanation for the trading irregularities was implausible, the Commission noted that the trading pattern was "more than coincidental." This of course says only that petitioners' theory is less probable than that of the Division. Thus, the "more likely than not" standard was properly applied.

(CCH) ¶ 24,987, 1991 WL 83515, at *2 (C.F.T.C. Jan. 23, 1991) (referring to deep-seated favoritism or antagonism as "pervasive" bias); Commission Rule 10.8(b)(2), 17 C.F.R. § 10.8(b)(2) (providing that party may seek disqualification on grounds of "personal bias, conflict or similar bases"). Inappropriate remarks by themselves are generally not disqualifying. *See NLRB v. Color Art, Inc.*, 932 F.2d 723, 727–28 (8th Cir.1991).

■ The ALJ's critique of trading practices exhibited his concerns about the commodity exchanges' methods of operation. His comments were not inappropriate, let alone indicative of deep-seated antagonism toward petitioners. An ALJ's credibility assessments, moreover, do not constitute bias. *See NLRB v. Pittsburgh S.S. Co.*, 337 U.S. 656, 659–60, 69 S.Ct. 1283, 93 L.Ed. 1602 (1949); *Midland Banana & Tomato Co. v. United States Dept. of Agric.*, 104 F.3d 139, 141–42 (8th Cir.1997) (adoption of one party's findings does not constitute due process violation). Finally, the ALJ's limiting of the scope of cross-examination simply forced counsel to conform his questions to the subject matter of the direct examination and in no way reflected partiality. *See Douglas v. Owens*, 50 F.3d 1226, 1230 (3d Cir.1995) (right to cross-examine a witness does not mean that party can do so "in whatever way, and to whatever extent" it desires). In any event, the cross-examination of Kozlowski was extensive. It "consumed three hours, filled 100 pages of transcript, and was ... comprehensive." *Reddy*, 1998 WL 44574, at *7.

Reddy finally contends that the Division's delay in bringing and prosecuting the case violated his right to a speedy trial. According to Reddy, the long delay between the trades in question and the bringing of the complaint hindered his ability to defend himself because it made it "totally impossible for him to recollect, or for him to find any other witnesses who would recollect, the actual circumstances of the trades so as to provide direct evidence ... with respect to [his] culpability or lack thereof."

■ Section 6(b) of the Administrative Procedure Act ("APA") requires that an agency conclude proceedings "within a reasonable time." 5 U.S.C. § 555(b). In determining reasonableness, we look to the source of delay—e.g., the complexity of the investigation as well as the extent to which the defendant participated in delaying the proceeding. *See Public Citizen Health Research Group v. Commissioner*, 740 F.2d 21, 35 (D.C.Cir.1984) (in deciding whether agency action has been unreasonably delayed, court "should consider the nature and extent of the interests prejudiced by delay, the agency justification for the pace of the decision, and the context of the statutory scheme out of which the dispute arises"). In the instant case, the investigation involved a complex pattern of trades that occurred over an extended period, and the accumulation of evidence naturally took time. *See generally LaCrosse v. CFTC*, 137 F.3d 925, 936 (7th Cir.1998) ("[T]he wheels of justice turn slowly."). Moreover, petitioners themselves requested numerous extensions of time, thereby contributing to the proceeding's delay.

In any event, petitioners suffered no prejudice. Reddy claims that, if the complaint had been filed sooner, he could have presented a better defense because he and other witnesses might have recalled the trades at issue, a purely speculative assertion. However, his argument is undermined by his prior assertions that he executed "at least a hundred thousand trades a year," and that he "would have a hard time recollecting a trade [he] did last week." Indeed, petitioners have, if anything, benefited from the delay, which has allowed them to continue trading and deferred their obligation to pay their civil monetary penalties.

3) SMayer et al.

SMayer, BMayer, SHB, and MCC challenge the Commission's liability determina-

tions with respect to each of the four categories of trade sequences alleged in the complaint. Gelbstein separately challenges the Commission's liability findings with respect to Schedules B through D. We find both sets of challenges to be meritless.[8]

### A. SMayer, BMayer, SHB, and MCC

 SMayer, BMayer, SHB, and MCC claim that the Commission erred as a matter of law by finding that the Schedule A trades constituted illegal wash .sales. These trades were between various accounts alleged by the division to be controlled jointly by SMayer and BMayer, and, if so, all gains were offset by all losses among the same parties. Petitioners argue that there is legally insufficient evidence of either common control of the accounts or identity of control of the trading. We disagree.

Although SMayer denied any ownership interest in MCC, he reported capital gains from MCC in an amount equal to that of his mother, the avowed owner, and the Commission quite plausibly found that he had such an interest. *See Mayer,* 1998 WL 80513, at *21. It further found that: SMayer, who together with BMayer owned two-thirds of SHB, "managed and controlled the operations of SHB"; "[f]unds were transferred between [MCC and SHB] without documentation of any underlying obligation"; "witnesses were unable to explain the reasons for various transfers"; and "all family members had authority to withdraw funds from the accounts at their own discretion." *Id.* Based on these findings, the Commission determined that the accounts had a common ownership and that the Schedule A trades

were wash trades because a losing trade in one account offset a winning trade in the other account, with no change in the overall financial position of the Mayers. *See id.* There was evidence to support each of these factual findings, and we are, therefore, bound by them. *See Colonial Stores Inc. v. FTC,* 450 F.2d 733, 739 (5th Cir. 1971) ("Findings of fact cannot and will not be set aside if the evidence in the record reasonably supports the administrative conclusion, even though suggested alternative conclusions may be equally or even more reasonable or persuasive.").

 Petitioners claim that even if the trades were wash sales, there was legally insufficient evidence that their participation in such transactions was knowing. This claim is entirely meritless.

Again, an agency may find the requisite intent based on circumstantial evidence. The Commission based its finding on several compelling factors. SMayer was in the heating oil pit daily while BMayer entered the heating oil pit only rarely and sometimes only long enough to execute a single trade. For example, the NYMEX streetbook shows that on more than one occasion, BMayer executed trades in both the heating oil pit and the platinum and palladium pit during the same minute. It is also highly significant that although BMayer rarely executed heating oil trades, a substantial percentage of those trades were with SMayer on the other side. Finally, the brothers on one occasion misused a certification procedure, suggesting that they were trying to cover up unlawful trading. *See Mayer,* 1998 WL 80513, at *22. We find that these factors are independently probative of intent, *see Bear Stearns,* 1991 WL 83520, at *15 (to prove

---

8. We note that petitioners' claims of legally insufficient evidence or erroneous findings of fact are severely undercut by their failure to keep records as required by Commission regulations. They claim that the Commission rejected the ALJ's factual finding that their failure to retain their trading cards was designed to eliminate audit trail evidence and that no adverse inference can be drawn from that failure. However, the Commission did not overturn the ALJ's finding of fact. It held only that the failure to keep records constitutes a *per se* violation of its recordkeeping requirements. It otherwise deferred to the ALJ's credibility findings. Petitioners therefore bear the heavy burden of the adverse inference drawn from that failure.

scienter, Division must identify factors that are significant apart from suspicious trading patterns), and agree with the Commission that "[u]nder those circumstances and given their joint financial interests in the accounts, it strains credulity to assume that the brothers traded independently," *Mayer*, 1998 WL 80513, at *22.

With regard to the Schedule B trades, there was evidence of trading patterns similar to that in *Reddy*. As the Commission noted, "[t]he NYMEX streetbook indicates that SMayer repeatedly traded, for the Mayer family accounts, the opposite sides of the same or similar quantity of the same commodity at the same price with the same individuals within very short time intervals." *Id.* at *23. It further credited the testimony of several individuals who traded opposite SMayer in these trades. They testified that during the period in question they engaged in accommodation trading with SMayer, albeit being understandably unable to identify particular trades. Finally, petitioners failed to comply with the Commission's reporting requirements, a failure that supports an inference that had the records been kept, they would have been unfavorable to petitioners' defense. *See* Note 8, *supra.* Given our discussion of liability in *Reddy*, the Commission's findings as to Schedule B trades are plainly reasonable.

Similarly, with respect to the Schedule C and D trades, involving allegations of bucketing, the evidence was clearly sufficient. Again there were trade sequences similar to those in *Reddy*, albeit in greater volume. Again, scalping or other lawful practices were proffered in defense. However, the Commission rejected those hypotheses, stating that "[g]enerally, when a broker or trader legitimately publishes a flat market, it would be expected that each side of the flat trade would be executed with different traders." *Mayer*, 1998 WL 80513, at *24. In other words, the fact that here, in trade after trade, both sides of the flat market were executed by the same traders was highly unusual. *See id.*

The Commission also found that petitioners' insistence that the suspicious trading pattern was consistent with scalping explained neither "why another trader would agree to both sides of the flat trade" nor "why these flat trades, with no apparent economic purpose, happened so often with the same individuals." *Id.* Again, we cannot say that these inferences are unreasonable. *See Haltmier*, 554 F.2d at 560 (as long as Commission acted reasonably in concluding that evidence supported findings, court will not disturb factual determinations). Indeed, the ALJ's and Commission's credibility findings, the cooperating witnesses' and expert testimony, the numerous audit trail irregularities, the failure to keep records, and the sheer volume of suspicious trade sequences amply support the Commission's conclusions.

### B. Gelbstein

■ Gelbstein first contends that his allegedly unlawful trades did not constitute a distinctive "pattern" sufficient to support an inference of artificial trading. Specifically, with respect to the trade sequences in Schedule B, he claims that three trades are too few to constitute a "pattern," especially where, as here, they were executed months apart—in May, July, and December, 1987. As to the trade sequences charged in Schedules C and D, Gelbstein argues that at least 78 of the alleged trades did not constitute a "pattern" of volatile trading since 61 of the trades were not executed at the same time, 56 were not executed for the same quantity, and 18 were not executed at the same price.

To be sure, three trades may, without more, be insufficient to establish a "pattern" supporting an inference of artificial trading. However, the Commission found that the three trade sequences in Schedule B were indistinguishable from the trading patterns of witnesses who testified to having unlawfully accommodated SMayer. *See Mayer*, 1998 WL 80513, at *23. Furthermore, it found that "[i]n all three trade sequences, Gelbstein sold heating oil to

SMayer who acted on behalf of one of the Mayer family accounts and, either in the same minute or one minute later, purchased the same quantity at the same price from SMayer acting on behalf of another Mayer family account." *Id.* Given these facts and Gelbstein's pattern of artificial trades with Mayer accounts reflected in the Schedule C and D sequences discussed below, there is sufficient evidence to support the Commission's inference that the three trades constituted a distinctive pattern.

 Contrary to Gelbstein's contention that the trade sequences alleged in Schedules C and D did not constitute a distinctive pattern, the evidence of pattern was powerful. These sale and repurchase transactions were virtually simultaneous and were executed at substantially the same price. "For each bucketed trade, Gelbstein executed a buy order and a sell order for the same commodity at the same time or shortly thereafter at the same or similar price with brokers who were acting on behalf of an SHB customer for one trade and a Mayer family account for the other." *Id.* at *25. We therefore agree with the Commission that such "*de minimis* differences in price, time, and quantity do not change the substantive nature of the wash trades evident in the schedules." *Id.*

 Gelbstein maintains that, even if the trade sequences in Schedules B–D constitute a distinctive and suspicious pattern of unlawful trading, it was not shown by a preponderance of the evidence that his participation in these trades was intentional. However, in its Amended Order, the Commission identified a number of independent factors—i.e., factors significant apart from the suspicious trading pattern—that supported its inference of intent. Specifically, it found that Gelbstein was at the center of the bucketed trades, that he was a longtime friend of SMayer, that he stood next to SMayer in the trading pit, and that he could not help but be aware of the pattern of trading that he was

facilitating. *See id.* The Commission thus reasonably concluded that Gelbstein not only had the opportunity to accommodate SMayer, but also that his close relationship with SMayer gave him a motive to do so. *Cf. United States v. Knowles,* 66 F.3d 1146, 1156 (11th Cir.1995) ("Although association alone is insufficient to prove participation, [it] is one factor that can be considered as evidence of a defendant's participation in a conspiracy." (internal quotation marks omitted)). Moreover, in deferring to the ALJ's credibility findings, the Commission implicitly found that Gelbstein's failure to retain trading cards was deliberate, *see* Note 8 *supra,* that he did not provide credible testimony about his knowledge of accommodation trading in the pit, and that the Division's witnesses were credible even though some of them testified as a condition of settlement with the Commission. None of these findings were erroneous as a matter of law. *See Yellow Freight Systems v. Reich,* 38 F.3d 76, 81 (2d Cir.1994) (credibility determinations entitled to special deference). There was, therefore, more than substantial evidence supporting the Commission's inference that Gelbstein knowingly participated in the trades.

Finally, Gelbstein argues that the Commission's decision should be set aside because of the delay in prosecuting the case. We disagree for the reasons stated in *Reddy.*

### b) *Sanctions*

 We agree with the Commission that the purpose of sanctions under the CEA is twofold: "to further the [CEA]'s remedial policies and to deter others in the industry from committing similar violations." *In re Miller,* No. 92–4, Comm. Fut. L. Rep. (CCH) ¶ 27,297, 1998 WL 107577, at *6 (C.F.T.C. Mar. 12, 1998). "It is old law, of course, that an agency sanction within statutory limits can be upset only if it reflects an abuse of discretion." *Haltmier,* 554 F.2d at 563; *accord Monieson v. CFTC,* 996 F.2d 852, 862 (7th Cir. 1993) (review is "highly deferential").

Typically, such an abuse of discretion will involve either a sanction palpably disproportionate to the violation or a failure to support the sanction chosen with a meaningful statement of "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A). The purposes of the APA provision "are to prevent arbitrary agency decisions, provide parties with a reasoned explanation for those decisions, settle the law for future cases, and furnish a basis for effective judicial review." *Armstrong v. CFTC*, 12 F.3d 401, 403 (3d Cir.1993). Thus, so long as an agency has "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)); *see also Hudson Transit Lines, Inc. v. ICC*, 765 F.2d 329, 336 (2d Cir.1985), we will uphold its choice of sanctions.

Both sets of petitioners argue that the Commission abused its discretion by failing to provide sufficient explanations of why it chose the sanctions it did. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48–49, 103 S.Ct. 2856. Petitioners in *Mayer* additionally argue that the Commission violated their due process rights by *sua sponte* increasing the sanctions imposed by the ALJ. We examine these objections in turn.

### 1) Choice of Sanctions

Petitioners in both cases argue that the Commission's choice of sanctions constituted an abuse of discretion for two reasons. First, they assert that the Commission failed to explain adequately its choice of sanctions. Second, they claim that the sanctions imposed were too severe.

Before examining these arguments, we note that the transgressions here are extremely serious. Artificial trades, such as wash transactions or bucketing, have no purpose save to avoid some legal, statutory, regulatory, or contractual obligation or to manipulate the market. They are used, for example, to avoid margin requirements, *see In re Three Eight Corp.*, No. 88–33, Comm. Fut. L. Rep. (CCH) ¶ 25,-749, 1993 WL 212489, at \*9 n. 8 (C.F.T.C. June 16, 1993) (finding that perpetrators of wash sale set up "customer omnibus account to be margined based on its net open position, rather than its gross position"), or taxes, *see Buckwalter*, 1991 WL 83522, at \*21 (finding "generation of tax benefits" to be "obvious motivation" for wash sale arrangements), to defraud customers, *see In re Baker*. No. 93–12, Comm. Fut. L. Rep. (CCH) ¶ 27,065, 1997 WL 282720, at \*7 (C.F.T.C. May 28, 1997) (finding that conviction for illegally offsetting customer orders under Section 4b(D) "conclusively establishes" intent to cheat or defraud customers), or to manipulate prices, *cf. In re Sundheimer*, No. 79–22, 1981 WL 26150, at \*2–\*3 (C.F.T.C. Sept. 16, 1981), *aff'd*, 688 F.2d at 150 (revoking registration for fictitious trading pursuant to defendant's guilty plea that he "fixed, rigged and fraudulently prearranged trades and manipulated the movement of prices," though finding said plea insufficient to sustain CEA 9(b) manipulation conviction); *In re Nordlicht*, No. 79–31, 1981 WL 26075, at \*1 (C.F.T.C. Jan. 7, 1981) (accepting settlement offer pursuant to complaint of wash trading and price manipulation). That is reason enough to impose meaningful sanctions. But artificial trading also strikes at the core purpose of exchanges—efficiently establishing accurate prices for futures contracts. *See Savage*, 611 F.2d at 284 ("[Wash sales and other fictitious trades] do not reflect the forces of supply and demand and therefore may mislead market participants." (citations omitted)); *see also* Pouncy, supra, at 1635 n. 55 ("Fictitious trading includ[ing] (w)ash trading [and] bucketing ... give the appearance of submitting trades to the open market while negating the risk or

price competition incident to such a market." (citations and internal quotation marks omitted)). More is at stake, therefore, than loss of revenue to the government or faithlessness to contractual or fiduciary obligations to customers.

We also note that, while artificial trading can over time be profitable, it is also difficult to detect. Because the gains available from artificial trading can be great and the danger of detection may seem low, the temptation to engage in such practices may be great. If deterrence is to be achieved, substantial penalties may be necessary.

■ Petitioners' criticism of the Commission's explanation of its choice of sanctions seems largely based on its failure to state explicitly the matters discussed in the prior two paragraphs. These propositions, however, are so well known in the area of the Commission's jurisdiction that we see no reason to require the Commission to repeat them in every artificial trading case. These propositions can be found in Commission decisions, as described above, and that is sufficient to assure us that the Commission had them in mind. In criminal cases, sentencing courts do not have to explain in every case the various differences between jaywalking, embezzlement, and torture murders. Moreover, the Commission's selection of sanctions involves judgments that cannot be accompanied by arithmetic exactitude or extended meaningful explication, in particular because they involve a judgment with regard to deterrence of other traders who might be tempted to engage in similar conduct. Such a judgment may be difficult to express in non-conclusory terms, as was so often the case in criminal sentencing before the Guidelines imposed, for better or worse, semi-mechanical rules based on the characteristics of the offense, criminal history of the defendant, etc., that allow somewhat extended discussion, albeit largely of the mechanical aspects.

■ What is required in the way of Commission explanation is not a ritualistic incantation of what is well-known in the area of the agency's jurisdiction but simply an indication sufficiently discernible to allow us to exclude arbitrariness as the explanation for a sanction. *See Armstrong*, 12 F.3d at 403–04 (agency explanation required "to prevent arbitrary agency decisions, provide parties with a reasoned explanation for those decisions, settle the law for future cases, and furnish a basis for effective judicial review"). We turn now to an examination of the particular sanctions imposed.

A. Cease and Desist Orders

■ In deciding whether to impose a cease and desist order, the Commission must determine whether there is a reasonable likelihood that the misconduct will be repeated. *See In re Fetchenhier*, No. 91–12, Comm. Fut. L. Rep. (CCH) ¶ 27,055, 1997 WL 232135, at *11 (C.F.T.C. May 8, 1997) (evidence must "reflect a pattern of conduct that establishes a likelihood the wrongdoing will be repeated"). "One indicator of the likelihood of future violations is the existence of a pattern of past conduct." *Mayer*, 1998 WL 80513, at *29. All that is required to determine that such a likelihood exists, therefore, is a pattern of misconduct rather than an isolated instance.

In *Reddy*, the Commission imposed a cease and desist order on the grounds that petitioners' "misconduct was repetitive and ... difficult to detect and ... therefore capable of repetition." 1998 WL 44574, at *14. Petitioners argue that these statements are overly conclusory and ambiguous and do not justify a prediction of future misconduct. *See SEC v. Patel*, 61 F.3d 137, 141–42 (2d Cir.1995).

■ To be sure, the Commission did not explicitly determine that "there is a reasonable likelihood that the misconduct will be repeated," only that such conduct is "capable of repetition." We are not, however, "disposed to overturn a sound deci-

sion if the agency's path, although not ideally clear, may reasonably be discerned." *Benmar Transport & Leasing Corp. v. ICC*, 623 F.2d 740, 746 (2d Cir. 1980); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856 ("We will ... 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974))). In this case, the Commission's path is easily discernible, even if the language used suggests only loosely that it found petitioners likely to repeat their misconduct. The question, then, is whether the Commission's determination that such conduct is likely to reoccur is a "sound decision." Given our discussion of liability and the seriousness of the misconduct involved, the Commission's findings of repetitive, systematic, and difficult-to-detect misconduct are adequate to support a reasonable apprehension of future violations.

**B. Registration Revocations**

■ A registration revocation is appropriate where the trader's continued registration will pose a substantial risk to the market. *See In re Gordon*, No. 90–19, Comm. Fut. L. Rep. (CCH) ¶ 25,667, 1993 WL 80512, at *5 (C.F.T.C. Mar. 16, 1993). Proof that a respondent is statutorily disqualified raises a presumption that he or she is unfit to act as a Commission registrant. "This presumption rests on the common sense inference that, once an individual has undertaken serious wrongdoing, there is a substantial risk he will undertake similar wrongdoing in the future." *Fetchenhier*, 1997 WL 232135, at *7. The respondent may rebut the presumption only by clear and convincing evidence that continued registration would not pose a substantial risk to the public. *See id.* The respondent may, for example, present mitigation evidence tending to show that the "weight that would ordinarily be accorded the presumption should be lessened," or rehabilitation evidence indicating "a changed direction in respondent's activi-

ties since the time of the wrongdoing underlying his conviction." *Id.* at *2.

■ Both Reddy and Sorkvist were subject to statutory disqualification and a presumption of unfitness for continued registration under Section 8a(2)(E) of the CEA, 7 U.S.C. § 12a(2)(E). Reddy, however, presented no mitigation or rehabilitation evidence to rebut this presumption. Thus, the Commission acted well within its discretion in concluding that his repetitive and systematic misconduct over a five-month period supported the presumption of unfitness. *See Reddy*, 1998 WL 44574, at *14.

■ Sorkvist, on the other hand, did attempt to make a showing of mitigation and rehabilitation to rebut the presumption of unfitness. He noted that he did not profit from the unlawful transactions, that he fully cooperated with all phases of the administrative proceeding, that he provided records to the Division and did not violate any recordkeeping requirements, that he had no prior or subsequent violations of the Act, that he participated in trades at prevailing prices at which other brokers also would have executed trades, and that he has since given up all customer business and now trades only for his own account. *See id.* The Commission nevertheless rejected his showing on the grounds that his failure to make a profit from his accommodation trades was insignificant in light of the fact that he was a willing accommodator whose ready assistance to other brokers in bucketing their customer orders undermined the integrity of the market; that his decision to trade solely for his own account did not evidence rehabilitation because his misconduct took place while he was trading for his own account; and that the passage of time, without more, does not establish rehabilitation. *See id.* We find that the Commission's rejection of Sorkvist's rebuttal evidence was not unreasonable and that its explanation adequately supports the conclusion that Sorkvist poses a substantial

risk to the market and is therefore unfit to act as a commission registrant.

■ SMayer, BMayer, and SHB are also subject to statutory disqualification from registration, pursuant to Section 8a(3)(A) of the CEA, 7 U.S.C. § 12a(3)(A). The Commission concluded that the gravity of petitioners' offenses justified the presumption of unfitness and determined that the pattern of illegal trading practices established a strong likelihood that the misconduct would be repeated. Revocation under these circumstances is appropriate. First, petitioners failed to rebut the presumption of unfitness with any mitigation or rehabilitation evidence. Second, the sheer volume and gravity of their violations support the Commission's conclusion that petitioners are likely to participate in future misconduct at substantial risk to the market.

C. Trading Bans

■ Trading bans are appropriate where there is a nexus between the violation and the integrity of the futures market. *See Monieson*, 996 F.2d at 862–63 (noting that court will defer to Commission's broad interpretation of what conduct affects integrity of market); *In re Citadel Trading Co. of Chicago, Ltd.*, No. 77–8, Comm. Fut. L. Rep. (CCH) ¶ 23,082, 1986 WL 66170, at *11 (C.F.T.C. May 12, 1986). As to the length of trading bans, the Commission has broad discretion to take appropriate action to deter violations and achieve the objectives of the CEA. *See Monieson*, 996 F.2d at 863. The Commission has announced that one of the factors it considers in determining the length of a particular ban is "the impact the ban will have on the respondent." *Mayer*, 1998 WL 80513, at *30.

■ With respect to Reddy and Sorkvist, the Commission justified the length of the trading bans—ten and five years respectively—on the fact that their misconduct was repetitive, systematic, and difficult to detect and therefore capable of

repetition. The Commission concluded that "the lengths of the trading bans are commensurate with the gravity of the violations found," which entailed "abuse of customers and a regulated public market." *Reddy*, 1998 WL 44574, at *14. With respect to SMayer, BMayer, SHB, MCC, and Gelbstein, the Commission concluded, "Respondents' offenses represent repeated and direct assaults on the integrity of the marketplace and erode public confidence in futures markets. Respondents' repeated violation[s] of the Act over the course of two-and-one-half years present the likelihood of a continuing risk to the market." *Mayer*, 1998 WL 80513, at *30. According to the Commission, the seriousness of this risk supported not only a permanent trading ban on SMayer, SHB, and MCC, but also a ten-year ban on Gelbstein and BMayer.

All petitioners argue that the Commission failed to explain with sufficient specificity why it imposed trading bans and how it arrived at the duration of the trading bans for each petitioner. We disagree.

The Commission noted that the misconduct here was serious, repetitive, and affected the integrity of the market. Those findings obviously reflect the Commission's quite reasonable judgment that petitioners sought to profit in known and unknown ways other than by buying low and selling high. Obligations to customers were flaunted, and the amount of misconduct was substantial, as was the time period over which it occurred. Moreover, the misconduct, as discussed earlier, went to the very integrity of the market's pricing mechanism. Finally, as the Commission noted in *Mayer*, the misconduct in question is difficult to detect; and such misconduct, when detected, must be heavily punished if deterrence is to be achieved.

We therefore conclude that the trading bans here were adequately explained and reasonable. The trading bans were graduated according to degree of misconduct. Sorkvist's ban of five years and SMayer's, SHB's, and MCC's lifetime bans are pro-

portionate to their misconduct as are the intermediate bans on other petitioners.

### D. Civil Monetary Penalties

■ In support of its imposition of civil monetary penalties on Reddy and Sorkvist, the Commission held that the fines "are commensurate with the gravity of the violations found." 1998 WL 44574, at *14. It further noted that "[t]he penalties reflect and seek to deter the betrayal of the public interest caused by respondents' abuse of customers and a regulated public market. The civil penalties are appropriate when considered in terms of gravity." *Id.* at *14–*15. Similarly, with respect to SMayer, BMayer, SHB, MCC, and Gelbstein, the Commission stated that "effective deterrence occurs when it is no longer worthwhile for a wrongdoer to risk engaging in acts that threaten the integrity of the markets." *Mayer*, 1998 WL 80513, at *31. It concluded that the fines imposed in its Amended Order "reflect and seek to deter the betrayal of the public interest inherent in respondents' abuse of a regulated public market." *Id.* Petitioners in both actions argue that these remarks are inadequate to permit intelligent appellate review. Again, we disagree.

Because the civil fines imposed in both cases fall within the statutory limit of $100,000 per violation, we review the amount of the penalties for a "rational relationship" to the offenses. *Monieson*, 996 F.2d at 863. It is certainly reasonable to measure the gravity of the violations by "the betrayal of public interest" and by the need to deter threats to the integrity of the markets, and "the calculation of civil money penalties does not lend itself to simple formulaic solutions." *Grossfeld*, 1996 WL 709219, at *12. For substantially the reasons stated with regard to trading bans, we conclude that the civil monetary penalties here were rationally related to the misconduct.

### 2) *Sua Sponte* Increase of Sanctions

SMayer, BMayer, SHB, MCC, and Gelbstein argue that the Commission abused its discretion by *sua sponte* increasing the sanctions imposed by the ALJ. Although they do not dispute the Commission's power to review the imposition of sanctions *de novo*, petitioners challenge the application of the *de novo* standard to them on the ground that they perfected their appeal before the Commission announced its adoption of a *de novo* standard in *Grossfeld*, 1996 WL 709219.

Petitioners contend that the Commission should have applied the old standard of review to their case because they appealed the ALJ's decision with the understanding that the Commission's review of sanctions would be deferential. Petitioners alternatively argue that, even if the *de novo* standard was appropriately applied to their case, the Commission's *sua sponte* increase of sanctions violated their due process rights because the Commission did not give them an opportunity to defend their position under the new standard of review. We find no merit in either claim.

■■ As to the first claim, a change in law that "speak[s] to the power of the court rather than to the rights or obligations of the parties" may be applied to a case pending at the time of the adoption of the new rule without raising concerns that it is impermissibly retroactive. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Under the APA, the Commission has "the powers which it would have in making the initial decision. . . ." 5 U.S.C. § 557(b). By changing the degree of deference to be accorded to the ALJ's choice of sanctions, the Commission neither altered the parties' substantive rights nor created new legal obligations or liabilities; it merely altered its standard of review. The new standard was, therefore, properly applied to all cases pending at the time of the change. *See Landgraf*, 511 U.S. at 274, 114 S.Ct. 1483; *see also LaFontant v. INS*, 135 F.3d 158, 165 (D.C.Cir.1998) (new rule "is not impermissibly retroactive because it does not attach new substantive

legal consequences[,] .... [and] does not create new legal liabilities, deprive a party of a legal defense he would otherwise have had, or otherwise affect the substantive rights of the parties before this court").

Petitioners' second argument is equally unpersuasive. In support of their claim that they were unconstitutionally deprived of the right to challenge the Commission's increase in sanctions, petitioners rely principally on *Baker*, 1997 WL 282720, and *Fetchenhier*, 1997 WL 232135. These cases, however, are inapposite.

Both *Baker* and *Fetchenhier* involved the Commission's decision to change how it considered aggravating conduct in fashioning sanctions under Section 9(b) of the CEA. Because the earlier standard had been in effect at the time of the trial before the ALJ, the Commission concluded that the respondents in *Baker* and *Fetchenhier* might reasonably have perceived certain available evidence to be legally irrelevant and might not, therefore, have proffered or developed it at trial. The Commission therefore gave the parties an opportunity to introduce additional evidence. The decisions in *Baker* and *Fetchenhier* were not based on the Commission's disagreement with the sanctions imposed by the ALJ, but on the fact that new, mitigating evidence might be forthcoming under the new standard. *See Fetchenhier*, 1997 WL 232135, at *13 ("Because of our departure from the reasoning of *Fetchenhier I* with regard to the role of other wrongdoing in imposing a trading ban, we will confer an opportunity to [the respondent] to introduce any additional evidence or argument directed to the other violations in order to show cause as to why a ten-year trading ban should not be imposed."); *Baker*, 1997 WL 282720, at *9 (same).

■ In the instant case, petitioners had every opportunity to proffer all available evidence relevant to the merits of sanctions. The *sua sponte* increase of sanctions did not render previously irrele-vant evidence relevant or otherwise create a need for a remand.

## CONCLUSION

The petitions for review are therefore denied.